### HERNDON *v.* THE STATE.

834

No. 9871.  MAY 24, 1934.

*John H. Geer, Benjamin H. Davis Jr.,* and *Ewing C. Baskette,* for plaintiff in error.

*John A. Boykin, solicitor-general, J. W. LeCraw, John H. Hudson, M. J. Yeomans, attorney-general, B. D. Murphy,* and *J. T. Goree,* contra.

BELL, J.  Angelo Herndon was indicted in Fulton County for the offense of attempting to incite an insurrection.  The offense is defined in the Penal Code, § 56, as "Any attempt, by persuasion or otherwise, to induce others to join in any combined resistance to the lawful authority of the State."  Section 57 declares that any person convicted of this offense shall be punished by death unless the jury recommend mercy, in which event the punishment shall be confinement in the penitentiary for not less than five nor more than twenty years.  In this case the jury found the defendant guilty, but recommended mercy and fixed his punishment at from eighteen to twenty years.

Before pleading to the merits, the defendant filed a motion to quash the indictment, and also a plea in abatement, alleging in each that he was a negro, and that members of his race were unlawfully, systematically, and intentionally excluded from the grand jury which indicted him, in direct violation of the fourteenth amendment of the constitution of the United States and of paragraph 3, article 1 of the constitution of the State of Georgia.  The

solicitor-general did not demur, but filed a traverse to each of these proceedings, and the issues made thereby were by consent of counsel submitted for trial to the judge without a jury. After hearing evidence at length from jury commissioners and others, the judge overruled and denied both the motion and the plea. Upon the call of the panel of 48 jurors from which to select a trial jury, the defendant filed a challenge to the array based upon the same ground, namely, that negroes were unlawfully, systematically, and intentionally excluded from the panel for the January term, 1933, during which the defendant was about to be tried. As in case of the other preliminary proceedings, the solicitor-general did not demur, but filed a traverse, and the issue thus made was likewise submitted to the judge for trial upon the evidence without a jury. After evidence was submitted, the motion was overruled.

The defendant was then tried upon the charge contained in the indictment with the result indicated. He made a motion for a new trial, which contained the usual general grounds and a number of special grounds added by amendment. The motion was overruled upon all grounds, and the defendant brought the case to this court.

█ The rulings by the trial judge upon the motion to quash, the plea in abatement, and the challenge to the array were all made on January 16, 1933. No exceptions pendente lite were filed to any of these rulings, but they were assigned as error in the motion for a new trial and also in the bill of exceptions. The judgment refusing a new trial was rendered on July 5, 1933. The bill of exceptions was certified on July 12, 1933.

Under the settled rules of practice applicable in this State, the rulings and findings of the trial judge upon the preliminary issues could not properly be asserted as grounds of the motion for a new trial relating to the main and final issue as made by the indictment and the plea of not guilty; but the conclusions reached by the court on such preliminary or collateral issues should have been excepted to pendente lite, or assigned as error in due time in the bill of exceptions. *Williford* v. *State,* 121 *Ga.* 173 (2) (48 S. E. 962) ; *Jones* v. *State,* 130 *Ga.* 274 (60 S. E. 740) ; *Herrin* v. *Grannis,* 40 *Ga.* 581; *Jones* v. *Daniel,* 106 *Ga.* 850 (33 S. E. 41) ; *Strickland* v. *State,* 115 *Ga.* 222 (41 S. E. 713) ; *State Mutual Life &c. Asso.* v. *Kemp,* 115 *Ga.* 355 (41 S. E. 652) ; *Waters* v. *State,* 158 *Ga.* 510 (123 S. E.

806) ; *Whitten* v. *Barrow,* 159 *Ga.* 57 (124 S. E. 874) ; *Benford* v. *State,* 18 *Ga. App.* 14 (4) (88 S. E. 747). Accordingly, the motion for a new trial, so far as it pertains to these matters, does not present any question of error for decision by this court.

The assignments of error upon the same rulings as contained in the bill of exceptions are also fatally defective, though for the different reason that they were not made in time. In all criminal cases the bill of exceptions shall be tendered and signed within 20 days from the rendition of the decision complained of. Civil Code (1910), § 6153. This applies, of course, to the final bill of exceptions by which the case is brought to the appellate court. As to exceptions pendente lite, it is declared: "Exceptions tendered before the final judgment, for the mere purpose of being made a part of the record, shall be certified to be true by the judge, and ordered to be placed on the record. Such exceptions must be tendered during the term. But if the court shall adjourn within less than thirty days from the date of the ruling complained of, such bill of exceptions pendente lite must be tendered within sixty days from the date of the order, decision, or ruling complained of." Civil Code (1910), § 6154. This provision of the law applies to both civil and criminal cases. *Strickland* v. *State,* supra. "Where several rulings are complained of in a bill of exceptions in a criminal case, this court can consider only such as were made within twenty days before the tendering of the bill of exceptions, unless there be exceptions pendente lite." *Regopoulas* v. *State,* 115 *Ga.* 232 (41 S. E. 619). See also *Banks* v. *State,* 114 *Ga.* 115 (39 S. E. 947) ; *Scarboro* v. *State,* 24 *Ga. App.* 27 (3 a), 29 (99 S. E. 637), and cit. It follows that since the rulings of the court upon the preliminary issues were not excepted to pendente lite, nor assigned as error in the bill of exceptions within the time prescribed by law, the plaintiff in error is not entitled to a review of these rulings.

But even if we should go further and consider these rulings upon their merits, the result could hardly be different to the plaintiff in error. The burden was upon him to show by evidence that negroes were excluded from the jury lists on account of their race or color. Martin *v.* Texas, 200 U. S. 316 (26 Sup. Ct. 338, 50 L. ed. 497). Nothing to the contrary was held either in Neal *v.* Delaware, 103 U. S. 370 (26 Sup. Ct. 567), or in Carter *v.* Texas, 177 U. S. 442 (20 Sup. Ct. 687, 44 L. ed. 839). In each of these cases the claim

was disposed of as being insufficient in law, without affording the defendant the right to sustain it by proof. In the present case evidence was heard and findings made thereon by the trial judge. Jury commissioners testified that negroes were never excluded by reason of their race or color, and that in fact members of this race were occasionally placed upon the lists for service on trial juries. The commissioners further testified: They recognized that there were taxpayers of Fulton County of the negro race who were qualified for jury service, but for the most part those who were thus qualified were professional men or holders of governmental positions and were excused by law from jury service. The population of Fulton County is large, and the commissioners could not well place every man on the lists who might be legally qualified. It seems that under this evidence the trial judge was not bound, as a matter of law, to find that negroes were excluded merely on account of their race or color. He could not have done so without imputing perjury to the jury commissioners who testified. This court, under its constitutional jurisdiction, would not be authorized to reverse the findings of the trial judge if they were supported by any evidence. In Martin v. Texas, supra, it was said that discrimination can not be established by merely proving that no one of the defendant's race was on the jury, and that an accused person can not, of right, demand a mixed jury, some of which shall be of his race, nor is a jury of that kind guaranteed by the 14th amendment to any race. It was further said in that case that "What an accused is entitled to demand, under the Constitution of the United States, is that in organizing the grand jury as well as in the impaneling of the petit jury, there shall be no exclusion of his race, and no discrimination against them, because of their race or color." In Thomas v. Texas, 212 U. S. 278 (29 Sup. Ct. 393), it was said that the question of unlawful exclusion is one of fact. In Murray v. Louisiana, 163 U. S. 101 (16 Sup. Ct. 990, 41 L. ed. 87), the evidence was similar to that produced in the present case, and it was said by the highest court that a careful inspection of the record failed to disclose any particular in which the accused was deprived of any right or immunity granted him under the laws or constitution of the United States. See also to the same general effect State v. Cook, 81 W. Va. 690 (95 S. E. 794) ; Washington v. State, 95 Fla. 298 (116 So. 470). The evidence in each of the following cases was materially stronger for the defendant.

Lee *v*. State, 163 Md. 56 (161 Atl. 284) ; Carrick *v*. State, 41 Okla. Cr. 336 (274 Pac. 896). In *Rawlins* v. *State*, 124 *Ga*. 31 (52 S. E. 1), affirmed, 201 U. S. 638 (26 Sup. Ct. 560, 5 Ann. Cas. 783), it was said : " The law passed by the General Assembly for the purpose of carrying into effect the constitutional provision does not require that all persons possessing the constitutional qualifications shall be selected. It reposes in the jury commissioners not only the authority to determine what men have these qualifications, but how many of such men shall be selected for jury duty in the county. The jury commissioners may select all belonging to this class, or they may select a lesser number. The jury-list of the county is not to be made up of any given number, but this is a matter left to the discretion of the jury commissioners. The number of persons selected for jury service is to be determined by the jury commissioners in the exercise of a wise discretion, taking into consideration the whole number of persons liable to jury service, the volume of business to be transacted in the various courts which require the presence of jurors, as well as the facilitation of business in such courts. They should keep in mind on the one hand the rights of those entitled to a jury trial, whether in civil or criminal cases, and on the other hand the rights of those who are subject to jury duty, making the list embrace such a number as will enable the courts to be carried on according to the spirit of the constitution and the law, and at the same time not making the number so small that jury service would become burdensome upon those selected for that duty. One placed upon the jury list by the commissioners is, so far as jury service is concerned, declared to be intelligent and upright. But the fact that a person's name is not upon the jury-list of the county is no evidence that he is not intelligent and upright, nor that the commissioners did not consider him as such." See also *Davis* v. *Arthur*, 139 *Ga*. 74 (2) (76 S. E. 676).

The grounds of the motion for a new trial referred to above were those numbered 9, 10, 11, and 12. Ground 13 complained of the rejection of evidence that negroes of Fulton County had served as jurors in the Federal court. If exception had been duly preserved, this contention would not have contained merit, since the evidence was irrelevant.

■ In ground 25 it is complained that the court erred in refusing to allow the defendant's counsel to ask the jurors individually and

severally, on the voir dire, the question, "Have you any prejudice against the defendant because he is colored, which would prevent you from arriving at a verdict on the trial of this case?" In this ground of the motion is the following statement: "Movant stated in his place that if prospective jurors on their voir dire had been permitted to answer the said question, defendant would have been better able to avail himself of his constitutional rights to select a fair and impartial jury for the trial of said case. The court refused to permit said question to be asked of said prospective jurors on their voir dire on the ground that the laws of the State of Georgia prohibited or made no provision for such question to be asked severally and individually, but the court allowed on movant's motion said question to be propounded to the prospective jurors in groups of twelve as they were impaneled in the jury-box. Movant insists that the refusal of the court to permit such question to be asked was prejudicial to movant, for the reason that movant did not have due opportunity to avail himself of his constitutional right to select a fair and impartial jury and because said refusal was and is a denial unto the defendant of equal protection of the laws and a denial unto him of the due process of law as guaranteed unto him by the fourteenth amendment to the constitution of the United States, section 1," quoting it.

This ground of the motion fails to show cause for a new trial. The method of examining jurors on the voire dire is regulated by statute in this State. Ga. L. 1855-6, p. 230. The provisions of this act are now contained in the Penal Code (1910), §§ 999-1004. The questions to be propounded are stated in section 1001, and include inquiry (1) as to whether the juror has formed and expressed any opinion in regard to the guilt or innocence of the prisoner at the bar; (2) as to whether he has any prejudice or bias on his mind either for or against the prisoner at the bar; and (3) whether the mind of the juror is perfectly impartial between the State and the accused. Since the passage of the act of 1856 this court has consistently held that neither counsel for the State nor for the defendant may, as a matter of right, ask a juror upon the voir dire any other questions than those prescribed by statute. In *Woolfolk* v. *State*, 85 *Ga.* 69 (9) 95 (11 S. E. 814), it was said: "Questions could not be made more searching than these, in order to determine the state of the juror's mind." But so careful was the law to pro-

vide for a fair and impartial jury that it did not stop with merely prescribing certain questions. It outlined a procedure whereby additional questions might be propounded. In § 1004, it is provided in effect that when any juror has been found competent "as aforesaid" he may yet be put upon the judge as a trior and shown to be incompetent at any time before the submission of evidence on the main issue. The judge, acting as a trior, is not confined to the statutory questions, but in order to test the juror's qualification may ask him any question except such as would tend to inculpate or disgrace him. It is true the additional examination may not be had as a matter of right, unless the juror is challenged and put upon the court as a trior. But the machinery provided for testing the juror's competency would seem to meet all constitutional requirements. In the *Woolfolk* case, supra, it was held that the statutory procedure was not in violation of the constitution of Georgia or the United States. The defendant here did not pursue this procedure, but sought, without challenging any juror, to propound additional questions to each of them. "Under the practice in this State of trying the competency of jurors, only the statutory questions can be asked in the first instance. If the juror answers the statutory questions satisfactorily, and is pronounced prima facie competent, and the parties put him before the court as trior, aliunde evidence of the untruthfulness of his answers must be offered, and it is not competent to propound questions to the juror himself to show his incompetency. It is within the province of the court to permit a further examination of the juror himself in rebuttal of the testimony offered to show his incompetency: *Nesbit* v. *State*, 43 *Ga.* 238, 248; *Carter* v. *State*, 56 *Ga.* 463 (3)." *Polk* v. *State*, 148 *Ga.* 34 (2) (95 S. E. 988). See also *Chapman* v. *State*, 148 *Ga.* 531 (4) (97 S. E. 546); *Duncan* v. *State*, 141 *Ga.* 4 (80 S. E. 317). While the defendant may not, as a matter of right, extend the examination beyond the statutory questions without first putting the juror on the court as a trior, it is yet true that the court may in its discretion allow additional questions. *Alford* v. *State*, 137 *Ga.* 458 (3) (73 S. E. 375). As a matter of fact, the court did allow the additional question in the instant case. The question was actually propounded to each and every juror. The question was put to them, however, in panels of 12, and the whole substance of the complaint is that each juror was not interrogated individually and severally. Since the judge

had a discretion as to whether he would allow the question, and did allow it, he might, within the same discretion, have permitted the requested individual examination, and thus was not strictly correct so far as he may have held, as stated in the motion, that the law prohibited such examination. The legal misconception, however, did not deprive the defendant of more than the mere right to have the judge exercise a discretion as to whether the question should be put to the jurors singly or in panels, involving a mere matter of procedure, with respect to which the statute is silent, and not relating to any substantive right. In *Williams* v. *State,* 60 *Ga.* 367 (27 Am. R. 412), followed in *Wilkerson* v. *State,* 74 *Ga.* 398, it was held that the examination on the voir dire should be made separately as to each juror, but this was based upon a construction of the statute and related merely to the *statutory* questions and *not to such additional questions* as might be asked only in the discretion of the court. The statute provides that on trials for felonies "any juror" may be put upon "his" voir dire, and the following questions shall be propounded to "him." Then follow the prescribed questions, all of which were presumably propounded singly in this case. See Penal Code, § 1001. It was obviously the quoted singular words which constrained the decision in the *Williams* case. In the present case, the judge, having exercised his discretion so as to allow an additional question, did not violate any substantial right of the defendant in refusing, for any reason, to permit the question to be propounded to each juror separately as requested. It should be noted further in this case that the defendant in his motion for a new trial does not complain that the action of the judge was erroneous upon the ground that he failed to exercise a discretion with which he was vested by law; but the assignment is that an absolute constitutional right was denied to movant. The judge pursued the course prescribed by statute, except that he went further in the defendant's favor than the statute required him to do. The statute was not attacked as being unconstitutional, and it is merely claimed that the action of the court, not the statute, deprived the defendant of a constitutional right. Did the court, merely in requiring the one question to be propounded collectively, as indicated, instead of singly, deny to the defendant any right guaranteed to him by the fourteenth amendment of the Federal constitution? We do not think the constitution was ever intended to be reduced to so

thin a tissue. In West v. Louisiana, 194 U. S. 258, it was said: "The limit of the full control which the State has in the proceedings of its courts, both in civil and criminal cases, is subject only to the qualification that such procedure must not work a denial of fundamental rights or conflict with specific and applicable provisions of the Federal constitution." In Jordan v. Massachusetts, 225 U. S. 167 (32 Sup. Ct. 651, 56 L. ed. 1038), the United States Supreme Court, quoting L. & N. R. Co. v. Schmidt, 177 U. S. 230, 236 (20 Sup. Ct. 620, 44 L. ed. 747), said: "It is no longer open to contention that the due-process clause of the fourteenth amendment to the constitution of the United States does not control mere forms of procedure in State courts or regulate practice therein. All its requirements are complied with, provided in the proceedings which are claimed not to have been due process of law the person condemned has had sufficient notice and adequate opportunity has been afforded him to defend." It was further said in the Jordan case that "When the essential elements of a court having jurisdiction in which an opportunity for a hearing is afforded are present, the power of a State over its methods of procedure is substantially unrestricted by the due-process clause of the constitution." 2 Honnold's Supreme Court Law, 846-850.

It can not be said that the defendant was denied due process of law or the equal protection of the laws merely because the question was propounded to the jurors in panels of 12 and not separately. Certainly nothing to the contrary was held in Aldridge v. U. S., 283 U. S. 308 (51 Sup. Ct. 470). In that case the court refused to permit any sort of inquiry as to whether the jurors had any racial prejudice such as would prevent a fair and impartial verdict. Furthermore, the Aldridge case was appealed from the District of Columbia, and an examination fails to show the existence of any statute in the district similar to the Georgia law. The same is true of the statutes of the several states from which decisions are cited in the Aldridge case. The question here is also different from that presented in Bailey v. United States, 53 Fed. (2) 982. Under the rule in the Federal district court (in Georgia) from which the case was appealed, the names of the jurors were not published or communicated to any one prior to the convening of court. It was pointed out in the decision that "the only information as to the persons whose names were on that list possessed by appellants and

their counsel before the right of challenging was to be exercised was that derived from looking at the prospective jurors and hearing their names read from the list and their answers to the three questions propounded by the court." It was held that the right of challenge was one of the most important of the rights secured to the accused, and that "it should not be required to be exercised before an opportunity is given for such inspection and examination of prospective jurors as is reasonably necessary to enable the accused to have some information upon which to base an exercise of that right." It is not contended here that the defendant was surprised or circumscribed by any such rule as was of force in the Federal District Court. The present case is further distinguished from the Bailey case upon the broad ground that in that case, as well as in the Aldridge case, supra, the court summarily "disposed of the requests, wholly and absolutely refusing to permit the additional questions urged." This is not to say that the decision in the Bailey case was in conformity to the statute law of this State.

■ The defendant was arrested without a warrant by police officers of the City of Atlanta. At the time of his arrest certain documents were found in his personal possession, in a "box under his arm," and this box and its contents were taken into custody by the arresting officers. Following the arrest, the defendant stated that he was rooming at a certain place to which the officers then carried him. The room identified by the defendant as his place of abode was searched and other documents were found. Ground 1 of the motion for a new trial complains of the ruling of the court admitting in evidence the "documents found in the personal possession of movant . . in a box under his arm," the evidence having been objected to upon the ground that the solicitor-general had "not exhibited any search warrant which authorized any officer to search defendant's person, nor has the solicitor exhibited any search warrant which authorizes any officer to enter the defendant's room and seize the box and contents contained therein." This ground of the motion contains several additional statements as reasons why the court should not have admitted the evidence. These additional statements can not be considered. It is the province of this court to consider only such questions as were presented to the trial court. Civil Code (1910), § 6502. Accordingly, an assignment of error on the admission of evidence is limited by the objections made at the

time the evidence was offered. The objections can not be enlarged by the addition of new matter as argument or grounds of error in the motion for new trial. *Williams* v. *State,* 147 *Ga.* 53 (92 S. E. 864); *Henslee* v. *Harper,* 148 *Ga.* 621 (97 S. E. 667); *Jenkins* v. *Jenkins,* 150 *Ga.* 77 (102 S. E. 425). It may be said now that other grounds of the motion for a new trial contained the same defects, and attention is here called to that fact in a general way in order to avoid needless repetition as we come to consider the other grounds. In the main we shall notice only such objections to the evidence as were made at the time the evidence was offered, and statements regarding the record will be limited accordingly.

The evidence obtained by the alleged illegal search and seizure was not inadmissible upon that ground. In the argument here the defendant relies upon the provisions of the constitution which are contained in Civil Code (1910), § 6362, relating to illegal searches, and it is further urged with great earnestness that the evidence should have been excluded in view of the similar provisions contained in the 4th amendment of the Federal constitution. Civil Code (1910), § 6688. So far as the objections relate to an application of the State constitution, the case is controlled by the decision in *Calhoun* v. *State,* 144 *Ga.* 679 (87 S. E. 893). It was held in that case that evidence discovered by the search of a person while he was under an illegal arrest, if relevant, is not inadmissible as contravening the constitutional provision against compelling a person to give testimony against himself. It was further held that articles taken from the premises of the accused may be admitted in evidence against him notwithstanding that they were discovered by an unlawful search and seizure. In such cases the criterion is, who furnished or produced the evidence? If the person suspected is made to produce the incriminating evidence it is inadmissible, but if his person or belongings are searched by another and the accused is not compelled to do any act or to produce any evidence tending to incriminate himself, the evidence thus discovered may be used against him, although it was obtained "without a vestige of authority." In the present case, it does not appear that the defendant was compelled to do any act or to produce any evidence. The decision in the *Calhoun* case, supra, was rendered by a full bench, and requests to overrule it have been denied in *Kennemer* v. *State,* 154 *Ga.* 139 (3) (113 S. E. 551); *Lester* v. *State,* 155 *Ga.* 882 (4)

(118 S. E. 674); *Jackson* v. *State,* 156 *Ga.* 647 (2) (119 S. E. 525).

With reference to the like provisions of the Federal constitution as contained in the 4th amendment, it has been repeatedly held by the Supreme Court of the United States that these provisions refer to powers to be exercised by the government of the United States and not to those of the individual States. See the discussion and citations in *Johnson* v. *State,* 152 *Ga.* 271 (109 S. E. 662), and in *Kennemer* v. *State,* supra. Moreover, the Supreme Court of the United States has also held that these provisions do not apply to evidence obtained by State or city officers so as to exclude it even in Federal prosecutions, where the officers were not acting with a view to such prosecution or in conjunction with Federal officers in obtaining the evidence. Weeks v. U. S., 232 U. S. 383 (34 Sup. Ct. 341, 58 L. ed. 652); Byars v. U. S., 273 U. S. 28 (4) (47 Sup. Ct. 248); Gambino v. U. S., 275 U. S. 310 (48 Sup. Ct. 137). Compare U. S. v. O'Dowd, 273 Fed. 600; Landwirth v. U. S., 299 Fed. 281 (4); Gordon v. U. S., 18 Fed. (2d) 530; Crank v. U. S., 61 Fed. (2d) 981. It is also the Federal rule that where the defendant knows before the trial of the possession by the prosecution of physical evidence and the manner in which it was obtained, he can not wait until the trial to make objection thereto, but should make his objection beforehand, and, failing to do so, he waives the right to object to the introduction of the evidence at the trial. Rossini v. U. S., 6 Fed. (2d) 350 (5); Moore v. U. S., 56 Fed. (2d) 794 (5), citing decisions by the United States Supreme Court. So in any possible view of the instant case, the court did not err in admitting the evidence referred to in the first special ground of the motion for a new trial.

There is no merit in ground 8, contending that the documentary evidence was inadmissible because the State did not introduce evidence to show that it was insurrectionary. The evidence was not objected to upon this ground, and besides this the literature referred to in this ground was in plain language and would speak for itself.

■ In ground 4 it is contended that the court erred in permitting a witness for the defendant to testify on cross examination: "A Negro doesn't happen to have the right to marry my daughter, under the laws of this State. I do not know how many states there are in the union where they do have that right." This evidence was ob-

jected to on the sole ground, "There is nothing whatever in the Communist 1932 election platform about intermarriage." In ground 5 it is complained that the court erred in allowing the prosecuting attorney to propound the following question, "Do you understand the Communist position equal rights for negroes to mean the right of a colored boy to marry your daughter, if you have one?", over objection that the *question* is "irrelevant and immaterial and calls for a conclusion of the witness." In ground 6 it is contended that the court erred in permitting the prosecuting attorney to ask the following question, "Did you know there are twenty states in the United States where the two races (white and negro) intermarry or mix?", over the same objection as quoted from ground 5.

Upon a consideration of ground 4 in connection with the brief of evidence and with grounds 5 and 6, it is clear that the evidence objected to as stated in ground 4 was given under the following circumstances: The evidence tended to show that the defendant was sent to Atlanta as an organizer for the Communist party, and that certain literature found in his possession was forwarded to him from the headquarters of this party in New York. Witnesses testified to admissions by the defendant of these facts. Among the documents was what purported to be a platform of the Communist party as promulgated during the presidential campaign of 1932. Plank 4 was as follows: "Equal rights for the Negroes and self-determination for the Black Belt." The witness had testified that he was familiar with all of the principles contained in the platform, and that he was in sympathy with some of them. On cross-examination the assistant solicitor interrogated him as to the meaning of plank 4, and finally asked him if he understood it to mean the right of a colored boy to marry the witness's daughter, if he had one. To this question the witness gave the reply as to the law of Georgia. The solicitor then asked him about other States, and his reply is the second statement of the testimony objected to. Other documents found in the defendant's possession and introduced in evidence tended to show that the Communist party did advocate racial and social equality for the Negro. These documents were admitted in evidence without objection, except for invalid reasons as indicated in division 3 of this opinion. It is a general rule of practice based upon sound principle that the admission of evidence over a party's objection will in no event require the grant of a new trial when sub-

stantially the same evidence is admitted without objection. *Payne* v. *Miller,* 89 *Ga.* 73 (14 S. E. 926); *Knorr* v. *Raymond,* 73 *Ga.* 749 (10); *Waters* v. *Wells,* 155 *Ga.* 439 (4) (117 S. E. 322). Thus, the question of racial and social equality, including, of course, the right of intermarriage, was already in the case in such way that the jury were bound to know of it in any event, and, so, the testimony objected to did not introduce a new factor. The defendant, therefore, could not be harmed by this testimony. The witness was correct in his statement as to the law of Georgia. Penal Code, § 678. It is to be remembered also that the sole objection was that there was nothing in "party 1932 platform" about intermarriage. While the assistant solicitor had asked about the platform, the witness made a detour and spoke of an entirely different subject, namely, the law of Georgia. It is thus apparent that the admissibility of the testimony did not depend upon the contents of the party platform, and that the court did not err in admitting it over the sole objection urged. Cf. 22 C. J. 195, and cit.

Referring now to grounds 5 and 6, we notice that each of these grounds omits all reference to evidence, the assignments of error being aimed only at the questions themselves. "In order to raise a question for decision by this court as to whether the trial court erred or not in overruling objections of the defendant to questions propounded by the solicitor-general to a witness, the answers to the questions should be shown, and a reference to the brief of evidence is not sufficient." *Fouts* v. *State,* 175 *Ga.* 71 (13) (165 S. E. 78). A ground of a motion for new trial must be complete in itself, without reference to other parts of the record. *Blakeney* v. *Bank of Hahira,* 176 *Ga.* 190 (2) (167 S. E. 114). If a question standing alone is inherently improper and prejudicial, the remedy is a motion for a rebuke or for a mistrial. Civil Code (1910), § 4957.

But to look further still, the witness was on cross-examination. The defendant himself, on direct examination, had interrogated the witness, not only as to the party platform of 1932, but had asked some other questions in reference to Communism. In response to the defendant's examination, the witness testified that without being informed as to the definition of Communism he could not answer the question as to whether he was "sympathetic with Communism." He did testify, however, "I find elements within Communism with which I agree." The defendant himself had brought about an ex-

pression of the attitude of the witness introduced by him. As noted above, the evidence tended to show that the tenets of the Communist party included racial and social equality for the Negro (see documentary evidence quoted below, in division 11 of this opinion). This witness, like any other witness, was subject to cross-examination. The right of cross-examination, thorough and sifting, belongs to every party as to witnesses called against him. Civil Code (1910), § 5871; *Mitchell* v. *State*, 71 *Ga.* 128 (6). This is a right which may be claimed by the State as well as by any other party.

Finally, the jury could not reasonably have been drawn from the main issue by any of the happenings referred to in grounds 4, 5, and 6. They were presumed to be intelligent and upright. They were aware of the fact that the defendant was on trial for the offense of attempting to incite an insurrection. A definition of this offense was later given to them in the charge. They must have known that the defendant could not be convicted merely because he may have become aligned with a party which advocated racial equality, and also that neither the statement of the witness nor the questions of the State's attorney could throw any affirmative light on the issue of guilt or innocence of the accused. Regardless of every other consideration in relation to these grounds, we should be compelled to attribute to the jurors a lesser degree of intelligence and uprightness than we are willing or authorized to do, before we could hold that the occurrences referred to in these grounds were such as to vitiate the verdict. The jurors had sworn that they had no such racial prejudice themselves as would prevent the rendition of a fair and impartial verdict, and we can not assume that they were inflamed by anything alluded to in the grounds under consideration, as urged in the briefs but not alleged in the motion for a new trial.

This case differs quite materially on its facts from Williams *v.* State, 25 Ala. App. 342 (146 So. 422), where the court did not effectually restrain highly inflammatory arguments by the prosecuting attorney, notwithstanding repeated objections thereto.

■ In ground 2, it is complained that the court erred in refusing to permit a witness who was a college instructor, and who was introduced by the defendant, to "qualify as an expert to testify to the non-insurrectionary character of the documentary evidence introduced by the State." The motion states that the witness gave cer-

tain testimony showing his proficiency in the subject of economics and his acquaintance with anarchistic, sociological, and Communistic literature, and also testified that he had written articles of an economic nature. This ground of the motion fails to set forth the "documentary evidence" as to which an opinion of the witness would have been sought, nor is it averred that the witness *would have* answered that it was "non-revolutionary" or "non-insurrectionary." To constitute a good assignment of error the exception should have stated at least the substance of the documentary evidence as to which the witness was expected to give an opinion, and it is also the rule that "A ground of a motion for new trial which assigns error because the court excluded certain testimony of a witness will not be considered where the movant has failed to show that the court was advised as to what the answer of the witness would be. *Story* v. *Brown,* 98 *Ga.* 570 (25 S. E. 582); *Freeman & Turner News Co.* v. *Mencken,* 115 *Ga.* 1017 (42 S. E. 369)." *Cox* v. *Moore,* 142 *Ga.* 487 (83 S. E. 115). The motion does not even indicate that the witness was expected to give an opinion as to the meaning of technical language, but, so far as appears, it was the purpose of the defendant to interrogate him as to the meaning of words as familiar to the jury as to any one else. "An expert may aid the jury, but he can not perform the functions of a juror and, under the guise of giving testimony, state a legal conclusion." *Travelers Ins. Co.* v. *Thornton,* 119 *Ga.* 455 (46 S. E. 678). See also *Kennedy* v. *Phillips,* 34 *Ga. App.* 166 (3) (128 S. E. 779).

In ground 3, it is contended that the court erred in permitting the same witness, on cross-examination, to testify as follows: "I am acquainted with what is known as the Communists of Soviet Russia or the Soviet Union, of the present form of government in the nation of Russia, that it is a government which succeeded the Kerensky government, which succeeded the former Czarist government; that it was brought about by a revolution, putting out the Czar and the assassination of the Czar and his family some time later, not necessarily as the result of a revolution. As to the Russian revolution, history so regards it, that there was a revolution, the Czarist government overthrown, the Kerensky government took charge, and after about six months another revolution of bloodless character in which the present regime succeeded the Kerensky government; I wouldn't attempt to dispute that as an historical fact."

The defendant objected to this evidence at the time it was offered on the following ground: "Those were all questions that necessitate an opinion and required [the witness] to answer with particular detailed knowledge of political science." This evidence was not inadmissible for the reason urged by the defendant. The facts stated by the witness were of an historical nature and were generally known. The jury presumably knew of them anyway, and the defendant was not harmed by the admission of the testimony. 23 C. J. 116-121.

■ In ground 7 of the motion for new trial it is alleged that during the progress of the trial the judge erred "in that he did intimate that movant was guilty" by the following statement made in the presence of the jury while a witness for movant was testifying: "The court: 'If Emory University is guilty of anything, we will try them; I think even if Emory University had actually attempted to incite riot, it wouldn't be material in this case, it is a question what this defendant has done.'" The record contains a note by the trial judge to the effect that the remark was made in ruling on an objection to testimony. Whether or not the statement might have been subject to criticism, it was not made as a part of nor during the instructions to the jury. The proper mode of excepting to this statement was by motion for mistrial, and the defendant failed to adopt this procedure. He could not abide the chance of a favorable verdict, and, "after the return of an adverse verdict, have that verdict set aside" on a motion for a new trial. *Tanner* v. *State,* 163 *Ga.* 121 (9) 130 (135 S. E. 917), and cit. See also *Herndon* v. *State,* 45 *Ga. App.* 360 (4) (164 S. E. 478).

■ In ground 14 error is assigned upon an instruction of the court which contained the definition of insurrection as in the Penal Code, § 55. The court further instructed the jury as to the legal statutory definition of an attempt to incite insurrection, and of course it was not improper, in connection therewith, to define the offense of insurrection, the purpose being to give the jury a better understanding of the elements of the offense for which the accused was being tried. The jury were specifically told that the defendant was being tried for an alleged attempt to incite insurrection. It was not error, as contended, to fail in the same connection to instruct the jury as to the method or means by which to determine the meaning of the offense "combined resistance to the lawful au-

thority of the State," as contained in the definition of insurrection. *Hall* v. *State,* 133 *Ga.* 177 (8) (65 S. E. 400).

■ In ground 15 it is alleged that the court erred in charging the jury "that mere possession of literature insurrectionary in its nature on the part of the accused wouldn't warrant a conviction in this case, nor would engaging in academic or philosophic discussions of abstract principles of economics or politics or other subjects however radical or revolutionary in their nature." This charge was excepted to, on the ground that it assumed that the literature introduced in evidence was insurrectionary, and thus invaded the province of the jury. There is no merit in this contention. And this is specially true in view of the additional instructions to the effect that all elements of the crime must appear from the evidence and the defendant's statement, to the satisfaction of the jury, that the court "can express no opinion and does express no opinion as to what has been proven."

In ground 16 it is contended that the court erred in charging "that advocacy, however reprehensible morally, is not sufficient to convict the defendant where there is no evidence to indicate that the advocacy would be acted upon immediately. In order to convict defendant, gentlemen, it must appear clearly by the evidence that immediate serious violence against the State was to be expected or advocated." It is contended that this charge was argumentative, and intimated that advocacy had been proved, also that the alleged advocacy of movant was reprehensible morally; and that the charge otherwise unduly emphasized the contentions of the State. These exceptions were not substantial.

In ground 17 error was assigned upon an instruction that "an attempt to commit an act which is, in fact, a crime is not complete unless the alleged crime is dangerously near completion; that the mere possession of radical literature, as I have before stated, alone is not sufficient to constitute the crime of attempting to incite insurrection." The exceptions to this charge were that it intimated that the literature was radical, that said charge failed to disclose to the jury the method by which they should determine whether the literature was radical or not, and unduly stressed the contentions of the State. There was no merit in these exceptions.

In ground 18 error is assigned upon an instruction relating to admissions or incriminatory statements. The exceptions were that

the charge was argumentative in the constant reference to "incriminatory statements," and contained an expression of opinion that such statements had been proved, and was confusing and misleading; also that the charge was not applicable to any facts or evidence adduced upon the trial of the case. None of these exceptions were meritorious. As to the correctness of the charge, see *Morris v. State*, 176 *Ga.* 243 (167 S. E. 509), and cit.

Ground 19 assigns error upon a charge to the effect that the State contended that the defendant was guilty of an attempt to incite insurrection, and that the defendant, on the other hand, "claims that he is guilty of nothing—that he is not guilty of attempting to incite to insurrection;" that the State had set out its contentions in the indictment, to which the defendant pleaded not guilty, which "raises a clear-cut issue of fact for this jury to determine under the evidence in the case and under the rules of law," as given in charge. The exceptions were that the charge failed to point out the issue of fact to be determined by the jury, intimated an opinion that while the defendant may not be guilty of the crime charged he must have been guilty of some crime, and that it was not applicable to any facts or evidence adduced upon the trial. Obviously these exceptions were groundless, if not frivolous. The same is true of the exceptions to the charge referred to in ground 20 of the motion, which exceptions are so insubstantial as not to require specific reference thereto.

With reference to the instructions excepted to respectively in grounds 16 and 17, it appears from the specification in the bill of exceptions and from the transcript made in compliance therewith, that the defendant requested the court to give each of these charges. Certainly he should not except to a charge which he requested.

■ In ground 21 error was assigned upon the refusal of the court to give a charge that all evidence of the Ford and Foster Clubs be excluded from consideration by the jury, since (as contended by the defendant) the Communist party in this State is a legal party and therefore entitled to existence in this State. Ground 22 complains of the refusal of a request to charge that there is a wide difference between demonstration and insurrection; that "demonstration" is the public exhibition of one's sympathy towards a social or political movement, and that "insurrection" is resistance with force against the lawful authority of the State of Georgia. The fact that the

Communist party may have been allowed to enter the names of its candidates upon the official ballot did not legalize its doctrines if they were in fact insurrectionary. Accordingly, there is no merit in ground 21. See, in this connection, Michie's Code of Georgia, § 138 (9). The requested definition of the word "demonstration" was too limited in its scope, and for this reason, if not for others, the court properly refused the request referred to in ground 22.

10. Grounds 23 and 24 complained that a witness for the State was allowed to use the term "darkey" in referring to the defendant, the contention being that the word was a term of opprobrium, and that its use was highly prejudicial to the defendant. To this objection, which was urged at the time, the court replied, "I don't know whether it is or not," but directed the witness to refer to the accused as the "defendant." The term darkey, as applied in this State to a person of color, is not opprobrious. Webster's New International Dictionary states one of the definitions as, "A Negro. *Colloq.;*" and contains nothing to indicate that it is a term of opprobrium.

■ Having determined that no substantial error of law was committed, we now consider the question of whether the evidence was sufficient to support the verdict. Before proceeding to examine the evidence, however, it is proper to determine the exact nature of the offense alleged to have been committed. Sections 55, 56, and 57 of the Penal Code are as follows: "Insurrection shall consist in any combined resistance to the lawful authority of the State, with intent to the denial thereof, when the same is manifested, or intended to be manifested, by acts of violence" (§ 55). "Any attempt, by persuasion or otherwise, to induce others to join in any combined resistance to the lawful authority of the State shall constitute an attempt to incite insurrection" (§ 56). "Any person convicted of the offense of insurrection, or an attempt to incite insurrection, shall be punished with death; or, if the jury recommend to mercy, confinement in the penitentiary for not less than five nor more than twenty years" (§ 57).

The defendant was not on trial for the offense of insurrection, nor for an attempt to commit that offense. He was indicted simply for an attempt to *incite* an insurrection, which by section 56 is made a distinct and independent crime under the law of this State. *Gibson* v. *State*, 38 *Ga.* 571; *Johnson* v. *State*, 169 *Ga.* 814, 817 (152

S. E. 76). Accordingly, the principles which might be applied in passing upon an alleged attempt to commit insurrection, or upon an alleged attempt to commit any other crime, are without any sort of relevancy to the present case. Compare *Groves* v. *State,* 116 *Ga.* 516 (42 S. E. 755, 59 L. R. A. 598); 16 C. J. 115, § 93. In U. S. *v.* Ford, 34 Fed. 26, it was said: "The indefinite nature of the offense, at common law, of an attempt to commit a crime, has induced the enactment of many statutes in England and this country, setting forth, in express terms, what acts shall constitute an attempt to commit the crimes referred to in such statutes." In such a case, the statute, of course, will govern. As indicated above, however, the defendant here was not indicted for an attempt to commit any offense whatsoever, but was charged with the doing of that which constituted an independent crime under the law of Georgia, namely, an attempt to induce others to join in combined resistance to the lawful authority of the State. The word "join" as used in the statute should be given its ordinary signification. It is defined in Webster's New International Dictionary as "to come together so as to be united and connected;" "to unite;" "to form a union;" or "to enter into association or alliance." The statute means then that any attempt to induce others to come together in any combined resistance to the lawful authority of the State shall constitute an attempt to incite an insurrection and shall be punishable as stated. It is immaterial whether the authority of the State was in danger of being subverted or that an insurrection actually occurred or was impending. In State *v.* Tachin, 92 N. J. L. 269 (106 Atl. 145), it was held competent for the State to make it an offense to attempt by speech to incite hostility and opposition even to the government of the United States. See also, in this connection, State *v.* Diamond, 27 N. M. 477 (202 Pac. 988, 20 A. L. R. 1535, note).

In State *v.* Quinlan, 86 N. J. L. 120 (91 Atl. 111), where the defendant was convicted under a statute making it a crime to advocate, encourage, or incite the killing or injuring of any person, or class of persons, it was held to be immaterial whether any person or class of persons were in fact killed or injured, "the gravamen of the offense being in the incitement or encouragement, and not in the actual commission of the offense." So, in the present case, it is unimportant that the defendant may not have been successful, if

he did in fact attempt to induce others to join in any combined resistance to the lawful authority of the State, as charged. Nor was it necessary that he attempted to induce any large number of persons to commit the offense of insurrection, since the offense could be committed by two or more persons. In re Charge to Grand Jury, 62 Fed. 828; 33 C. J. 159. Force must have been contemplated, but, as said above, the statute does not include either its occurrence or its imminence as an ingredient of the particular offense charged. State v. Tachin, supra. Nor, would it be necessary to guilt, that the alleged offender should have intended that an insurrection should follow instantly or at any given time, but it would be sufficient that he intended it to happen at any time, as a result of his influence, by those whom he sought to incite. It was the intention of this law to arrest at its incipiency any effort to overthrow the State government, where it takes the form of an actual attempt to incite others to insurrection. In *Gibson* v. *State,* 38 *Ga.* 571, supra, it was said of section 4250, now section 56: "This does not contemplate an attempt by the defendant at insurrection, or to commit insurrection by himself, but an attempt to incite others to join in insurrection. A person may commit the offense of an attempt to incite others to join in, or to commit insurrection who neither promises nor attempts to join in it, or commit it himself. He may stand aloof entirely when it is committed, and still he may, by his influence, have incited it, and may be responsible for it." It was further said in that case that the section as to penalty prescribed "a penalty for attempt *at* insurrection, but none for an attempt to *incite* insurrection." Hence, the defendant was discharged in that case because the statute failed to prescribe a penalty for the specific offense of which he was convicted. This defect, however, was cured by the act of December 12, 1871 (Ga. L. 1871, p. 19), so that the provisions as to penalty are now as stated in the Penal Code, § 57. From what has been said, the question here is simply this: did the evidence show that the defendant made any attempt to induce others to come together in any combined forcible resistance to the lawful authority of the State? This is the only question to be determined under the evidence.

The evidence, which included certain admissions by the defendant, established the fact that he had come to Atlanta from another State as an organizer for the Communist Party, and that he had no

other interest in view. The evidence did not show the exact time of his arrival, but it appeared that under an assumed or different name he rented a postoffice box for the reception of mail in the Atlanta postoffice in September, 1931, and it was a fair inference that he had not resided here for any considerable length of time and had not become identified with any local business enterprise. He was indicted in July, 1932, and it appeared that in the meantime he had actively espoused the cause of the unemployed, and had inspired a mass demand for an appropriation by the county authorities for their relief. The jury were authorized to find that his chief objective was to press the cause of the Communist Party, and that his agitations with reference to local conditions were not the result of any particular interest which he may have had in the local welfare, but were pursued merely as a method of fomenting a state of discontent and unrest as a goodly premise for his party program, or, in other words, as a means to an end. The jury, on seeing that his principal mission was to spread the doctrine of the Communist Party, could weigh the other circumstances in the light of this fact. In view of it, the documents found in his possession assumed an added significance, and the use to which the defendant may have applied them became an easier question for solution by the jury. Were these not the tools to be used by the defendant in the execution of his mission? Did he remain in Atlanta for about a year without using them? He told the officers that he was sent to Atlanta as a paid organizer for the Communist Party, and that the literature was sent to him from the headquarters of this party in New York City. Did he take the means and instruments supplied to him and fail to use them? Was he active or inactive as an agent of his employer? How far did he go in the discharge of the responsible duties assigned to him? The defendant was apparently busy at the time of his arrest, since he had just approached his postoffice box and taken out his mail, and was carrying at the time a box containing Communistic literature. The number of this box was 339.

The evidence showed that he had distributed circulars "Issued by the Unemployed Committee of Atlanta, P. O. 339," and that he was in fact the author of these circulars. While the circulars here referred to may not have been of any considerable importance within themselves, they showed the defendant's connection with the un-

employment committee, and with the other evidence it was a fair conclusion that the name "Unemployment Committee" was a term common in the Communist Party applicable to its workers or propagandists. It was not shown directly that he ever distributed any literature except two classes of circulars of a more or less harmless character, but the case depended mainly upon circumstantial evidence and must not be measured by the limits of the direct evidence introduced. To say that the defendant did no more than was shown by the direct evidence would deny to the State all right to the benefit of circumstantial evidence, and this, of course, can not be done.

With reference to admissions, the defendant stated to one of the arresting officers that "he was sent here by this Communist Party as an organizer for them, representing this Communist Party." He also stated that the material, or literature, found in his possession was "sent to him from headquarters of this Communist Party in New York." He directed the officers to his room in which a part of the literature was found.

Shortly after his arrest he was taken before Mr. E. A. Stephens, assistant solicitor-general, who testified as follows: "He stated that he came here from Lexington, Kentucky, where he was an employee of some coal mine company, he stated that a man by the name of E. Doran came there and got him interested in the Communist Party, and that he joined the Nation Communist Party at Lexington, Kentucky, . . he stated that he was sent to Atlanta to take the position of Organizer for the Communist Party; . . he stated he was paid $10 a week, sometimes in cash and sometimes in money orders. At that time he stated to me that his duties were, as organizer for the Communist Party, to call meetings, educate or disseminate information regarding the party at these meetings, to distribute literature, to secure members for the organization and generally to work up an organization of the Communist Party in Atlanta. . . He said he had held or attended two meetings, and then later when questioned about where they were held he designated the meeting places of three meetings that he had called and had been held . . he did give me the names of persons that he said were members of the organization, said he only have [had] five or six actual members at that time—actual members, as he put it—said the meetings were sometimes in vacant

houses and sometimes in private houses . . he made these statements to me freely and voluntarily. I want to state further, among the other things he said in talking to me about this quantity of literature here in the suitcase and in the grip, a part of which you will notice has never been taken out of the wrapper—there are several packages like this—in questioning him what this was sent to him for, he stated for distribution at his meetings, the same with reference to many of the books that he had in these two receptacles there . . he said that he called the meetings and held them and conducted the meetings; as to whether he said he made any speeches at any of those meetings, I don't know that the word 'speech' was used." The localities of the meetings were given and were shown to be situated in Fulton County.

Other evidence was introduced which showed that the defendant had induced others to become members of the Communistic Party, about twelve in all. What purported to be minutes of three meetings were also found in the defendant's possession. Some of the minutes made reference to "section committees," and from the evidence as a whole the jury were authorized to find that the phrase "section committee," like the term "unemployed committee," was a designation applied to a subordinate division of the Communist Party. In his statement to the jury he denied none of the testimony to which reference has been made, and made no explanation or statement whatsoever with regard to the literature.

Among the documents, were nine "Membership Books . . of the Communist Party of the U. S. A.," containing the names of persons "admitted" to the party in Atlanta. These books also contained what purported to be "extracts from the Statutes of the Communist Party of the U. S. A.," some of which were as follows: "A member of the Party can be every person from the age of eighteen up who accepts the program and statutes of the Communist International and the Communist Party of the U. S. A., who becomes a member of a basic organization of the Party, who is active in this organization, who subordinates himself to all decisions of the Cominterm and of the Party, and regularly pays his membership dues. . . The Communist Party, like all sections of the Cominterm, is built upon the principle of democratic centralization. These principles are: . . Regular reporting of the Party committees to their constituents. Acceptance and carrying out

of the decisions of the higher Party committees by the lower, strict Party discipline, and immediate and exact applications of the decisions of the Executive Committee of the Communist International and of the Central Committee of the Party. . . The basis of the Party organization is the nucleus (in factories, mines, shops, etc.) which all Party members working in these places must join. The nucleus consists of at least three members. Newly organized nuclei must be endorsed by the leading committee of the Section in which the shop nuclei are organized. . . The strictest Party Discipline is the most solemn duty of all Party members and all Party Organizations. The decisions of the CI and the Party Convention, of the CC and of all leading committees of the Party, must be promptly carried out. Discussion of question over which there have been differences must not continue after the decision has been made." In the same membership books we find the following question and answer: "What is the Communist Party? The Party is the vanguard of the working class and consists of the best, most class conscious, most active, the most courageous members of that class. It incorporates the whole body of experience of the proletarian struggle, basing itself upon the revolutionary theory of Marxism and representing the general and lasting interests of the whole of the working class. The Party personifies the unity of proletarian principles, of proletarian will and of proletarian revolutionary action. (From the program of the Communist International.) We are the Party of the working class. Consequently, nearly the whole of that class (in time of war and civil war, the whole of that class) should work under the guidance of our Party, should create the closest contacts with out [our] Party. (Lenin.) He who weakens, no matter how little the iron discipline of the Party of the proletariat (especially during the period of dictatorship), effectually helps the bourgeoisie against the proletariat (Lenin)."

The authenticity of the literature was effectually admitted by the defendant, and thus no reasonable question can be raised in this case as to the reality of its apparent source, whether it purports to be an expression from the New York headquarters or from the main party organization, wherever located.

The defendant himself was admittedly a member of the party, and he showed that he was connected with a "party committee."

Did he accept its discipline, program, and statutes, and endeavor to execute them as other members were required to do? These were questions to be considered by the jury, and we can not say that they should have been answered favorably to the accused. When he solicited members, and thus pledged them to the party program, what, indeed, was contemplated? Was it an "attempt to induce others to join in combined resistance to the lawful authority of the State?" This was a question to be answered by the jury in the light of that program; and here let us notice some of the additional literature bearing upon the motive and intent of the party organization, and which the jury had before them for their study and consideration.

One of the documents was a booklet entitled "THE COMMUNIST POSITION ON NEGRO QUESTION." On the outside cover was a map of the United States, under which was the following: "SELF DETERMINATION FOR THE BLACK BELT." The map had a dark belt across it, beginning with a portion of Arkansas and Louisiana, and extending generally eastward through the States of Mississippi, Alabama, Florida, and Georgia, and thence up the coast through several States. The belt included about two thirds of the State of Georgia, mostly in the central section, from west to east. On page 28 of the pamphlet appeared the following: "In the South, the fight must be fearlessly developed against the thievery and robbery of the Southern capitalists and landlords; against their whole system of enslaving the Negroes based on Jim-Crowism and lynch terror. We must fight there not merely against inequality, but against the whole system by which this inequality is enforced. In the first place, our demand is that the land of the Southern white landlords, for years tilled by the Negro tenant farmers, be confiscated and turned over to the Negroes. This is the only way to insure economic and social equality for the tenant farmers. Secondly, we propose to break up the present artificial state boundaries established for the convenience of the white master class, and to establish the state unity of the territory known as the 'BLACK BELT,' where the Negroes constitute the overwhelming majority of the population. Thirdly in this territory, we demand that the Negroes be given the complete right of self-determination; THE RIGHT TO SET UP THEIR OWN GOVERNMENT in this territory and the right to separate, if they wish, from the United States. Around these demands

for the Negroes, as I have outlined them here—with the revolutionary white workers in the very fore-front of the struggle—the unity of white workers, small farmers and the Negro masses must be established. NOT PROMISES: BUT ACTION. But the Negroes have listened to many promises. Every political faker has promised equality and freedom. The white workers can win the confidence of the Negro masses, not by promises, BUT BY ACTION."

The matter last quoted appeared to be an extract from a speech nominating a candidate for vice-president of the United States on the Communist ticket for 1932; but, even so, it appeared in a pamphlet entitled "The Communist Position on the Negro Question," and came to the defendant with the implied, if not express, approval of the party headquarters in New York. In any view, it illustrated the program in Georgia, and shed light upon the purpose and intent of the defendant in soliciting members, and in otherwise executing his mission as the party agent.

This pamphlet which carried the map of the "BLACK BELT," also contained the following: "RESOLUTIONS OF THE COMMUNIST INTERNATIONAL ON THE NEGRO QUESTION IN THE UNITED STATES." "Resolution of Communist International, October, 1930. 1. . . The struggle of the Communists for the EQUAL RIGHTS of the Negroes applies to all Negroes, in the North as well as in the South. The struggle for this slogan embraces all or almost all of the important special interests of the Negroes in the North, but not in the South, where the main Communist slogan must be: THE RIGHT OF SELF-DETERMINATION OF THE NEGROES IN THE BLACK BELT. These two slogans, however, are most closely connected. The Negroes in the North are very much interested in winning the right of self-determination of the Negro population of the Black Belt and can thereby hope for strong support for the establishment of true equality of the Negroes in the North. In the South the Negroes are suffering no less, but still more than in the North from the glaring lack of all equality; for the most part the struggle for their most urgent partial demands in the Black Belt is nothing more than the struggle for their equal rights, and only the fulfillment of their main slogan, the right of self-determination in the Black Belt, can assure them of true equality. . . It is the special duty of the revolutionary Negro Workers to carry on tireless activity among the Negro working masses to free them of their distrust of the white

proletariat and draw them into the common front of the revolutionary class struggle against the bourgeoisie. . . The slogan of the right of self-determination occupies the central place in the liberation struggle of the Negro population in the Black Belt against the yoke of American imperialism. But this slogan, as we see it, must be carried out only in connection with two other basic demands. Thus, there are three basic demands to be kept in mind in the Black Belt, namely, the following: (a) CONFISCATION OF THE LANDED PROPERTY OF THE WHITE LANDOWNERS AND CAPITALISTS FOR THE BENEFIT OF THE NEGRO FARMERS. The landed property in the hands of the white American exploiters constitutes the most important material basis of the entire system of national oppression and serfdom of the Negroes in the Black Belt. More than three-quarters of all Negro farmers here are bound in actual serfdom to the farms and plantations of the white exploiters by the feudal system of 'share cropping.' Only on paper and not in practice are they freed from the yoke of their former slavery. The same holds completely true for the great mass of black contract laborers. Here the contract is only the capitalist expression of the chains of the old slavery, which even today are not infrequently applied in their natural iron form on the roads of the Black Belt (chain-gang work). These are the main forms of present Negro slavery in the Black Belt, and no breaking of the chains of this slavery is possible without confiscating all the landed property of the white masters. Without this revolutionary measure, without the agrarian revolution, the right of self-determination of the Negro population would be only a Utopia or, at best, would remain only on paper without changing in any way the actual enslavement. (b) ESTABLISHMENT OF THE STATE UNITY OF THE BLACK BELT. At the present time this Negro Zone—precisely for the purpose of facilitating national oppression—is artificially split up and divided into a number of various states which include distant localities having a majority of white population. If the right of self-determination of the Negroes is to be put into force, it is necessary wherever possible to bring together into one governmental unit all districts of the South where the majority of the settled population consists of Negroes. Within the limits of this State there will of course remain a fairly significant white minority which must submit to the right of self-determination of the Negro majority. There is no other possible way

of carrying out in a democratic manner the right of self-determination of the Negroes. Every plan regarding the establishment of the Negro state with an exclusively Negro population in America (and of course still more exporting it to Africa) is nothing but an unreal and reactionary caricature of the fulfillment of the right of self-determination of the Negroes, and every attempt to isolate and transport the Negroes would have the most damaging effect upon their interests. Above all, it would violate the right of the Negro farmers in the Black Belt not only to their present residences and their land, but also to the land owned by the white landlords and cultivated by Negro labor. (c) RIGHT OF SELF-DETERMINATION. This means complete and unlimited right of the Negro majority to exercise governmental authority in the entire territory of the Black Belt, as well as to decide upon the relations between their territory and other nations, particularly the United States. It would not be right of self-determination in our sense of the word if the Negroes in the Black Belt had the right of self-determination only in cases which concerned EXCLUSIVELY the Negroes and did not affect the whites, because the most important cases arising here are bound to affect the whites as well as Negroes. First of all, true right to self-determination means that the Negro majority and not the white minority in the entire territory of the administratively united Black Belt exercises the right of administering governmental, legislative, and judicial authority. At the present time all this power is concentrated in the hands of the white bourgeoisie and landlords. It is they who appoint all officials, it is they who dispose of public property, it is they who determine the taxes, it is they who govern and make the laws. Therefore, the OVERTHROW OF THIS CLASS RULE in the Black Belt is unconditionally necessary in the struggle for the Negroes' right to self-determination. This, however, means at the same time the overthrow of the yoke of American imperialism in the Black Belt on which the forces of the local white bourgeoisie depend. Only in this way, only if the Negro population of the Black Belt wins its freedom from American imperialism even to the point of deciding ITSELF the relations between its country and other governments, especially the United States, will it win real and complete self-determination. One should demand from the beginning that no armed forces of American imperialism should remain on the territory of the Black Belt. . . As stated in the

letter of the Political Secretariat of the E. C. C. I. of March 16, 1930, the Communists must unreservedly carry on the struggle for the self-determination of the Negro population in the Black Belt in accordance with what has been set forth above. It is incorrect to say that the Communists are only to carry on propaganda or agitation for the right of self-determination, but not to develop any activity to bring this about. No, it is of the utmost importance for the Communist Party to reject any such limitation of its struggle for this slogan. Even if the situation does not yet warrant the raising of the question of uprising, one should not limit oneself at present to propaganda for the 'Right of Self-Determination' but should organize mass actions such as demonstrations, strikes, tax boycott movements, etc. . . It would be a mistake to imagine that the right of self-determination slogan is a truly revolutionary slogan only in connection with the demand for complete separation. The question of power is decided not only through the demand of separation, but just as much through the demand of the RIGHT to decide the separation question and self-determination in general. A direct question of power is also the demand of confiscation of the land of the white exploiters in the South, as well as the demand of the Negroes that the entire Black Belt be amalgamated into a State unit. Hereby, every single fundamental demand of the liberation struggle of the Negroes in the Black Belt is such that if once thoroughly understood by the Negro masses and adopted as their slogan it will lead them into the struggle for the overthrow of the power of the ruling bourgeoisie, which is impossible without such revolutionary struggle. One can not deny that it is just possible for the Negro population of the Black Belt to win the right to self-determination during capitalism; but it is perfectly clear and indubitable that this is possible only through successful REVOLUTIONARY STRUGGLE for power against the American bourgeoisie, through WRESTING the Negroes' fight of self-determination from American Imperialism. Thus, the slogan of right to self-determination is a real slogan of NATIONAL REBELLION which to be considered as such need not be supplemented by proclaiming struggle for the complete separation of the Negro zone, at least not at present. . . It is particularly incumbent on Negro Communists to criticize consistently the half-heartedness and hesitations of the petty-bourgeois national-revolutionary Negro leaders in the liberation strug-

gle of the Black Belt, exposing them before the masses. . . Simultaneously, Negro Communists must carry on among the Negro masses an energetic struggle against nationalist moods directed indiscriminately against all whites, workers as well as capitalists, Communists as well as imperialists. Their constant call to the Negro masses must be: REVOLUTIONARY STRUGGLE AGAINST THE RULING WHITE BOURGEOISIE, THROUGH A FIGHTING ALLIANCE WITH THE REVOLUTIONARY WHITE PROLETARIAT."

The booklet from which the foregoing statements are quoted contained a foreword as follows: "The documents presented in this pamphlet are the result of the very best and most careful thought, study and experience of our party. The correct line on our Party has been hammered out in years of bitter struggle—struggle with the enemies of Bolshevism. . . But in the furious struggle against our enemies, and against the influence of these enemies upon our own ranks; with the indispensable guidance of the Communist International—our Party has hammered out its BOLSHEVIK line on the Negro question."

Another document found in the defendant's possession was a book entitled "COMMUNISM AND CHRISTIANISM," and containing the following statements: "As the machinery of capitalist government, including the armed forces of the nation, conserves the monopoly by the capitalist class of the wealth taken from the workers, the working class must organize consciously and politically for acquiring the powers of government, national and local, in order that this machinery, including these forces, may be converted from an instrument of oppression into the agent of emancipation and the overthrow of privilege, aristocratic and plutocratic. · The trouble with every reformitory socialism of modern times is, that it undertakes the impossibility of changing the fruit of the capitalist state into that of the communistic one, without changing the political organism; but to do that is as impossible as to gather grapes from thorns or figs from thistles. Hence an uprooting and replanting are necessary (a revolution not a reformation) which will give the world a new tree of state. Capitalism no longer grows the fruits (foods, clothes and houses) which are necessary to the sustenance of all the world. Hence it must be dug up by the roots in order that a tree which is so organized that it will bear these necessities for the whole world may be planted in its place. The people in

Russia have accomplished this uprooting and replanting (this revolution) in the case of their state, and those of every nation are destined to do the same in one way or another, each according to its historical and economical development, some with much violence, most, I hope, with but little."

The evidence also included a document entitled "AN APPEAL TO SOUTHERN YOUNG WORKERS." Following are some of the statements contained in this document: "The Young Communist League is the champion not only of the young white workers but especially of the doubly oppressed Negro young workers. The Young Communist League fights against the whole system of race discrimination and stands for full racial, political, economic and social equality for all workers. . . The Young Communist League is a section of the Young Communist International, the revolutionary leader of the young workers the world over and accepts the guidance of the Communist Party of America. The Young Communist League fights for: . . . FULL POLITICAL, SOCIAL AND RACIAL EQUALITY FOR THE NEGRO WORKERS. . . SMASH THE NATIONAL GUARD, THE C. M. T. C. AND R. O. T. C."

Still another document was one entitled "PARTY ORGANIZER" and containing a number of articles on the Communistic Party, on what it advocates, and the manner of organizing workers.

In his statement to the jury the defendant said in part: "We know the system we are living under is on the verge of collapse; no matter what system we are living under, it has developed to its highest point and comes back—for instance, you can take a balloon and get so much air in it, and when you get too much it bursts; so with the system we are living under—of course, I don't know whether that is insurrection or not, but the question, it has developed to its highest point."

The defendant here apparently expressed the view that a crisis was impending. Did this statement not indicate a belief that the conditions were opportune for a revolution or insurrection and that now or soon would be a seasonable time to strike? We repeat that the case does not turn alone upon the direct evidence that circulars advocating unemployment relief were distributed. It must not be overlooked that the defendant was an organizer and induced a number of persons to become members of the Communist Party, the purpose and intent of which are thoroughly illustrated by the

documentary evidence from which we have quoted. The establishment of the "Black Belt" by peaceful and through lawful processes could not have been reasonably anticipated. It called for "breaking up State lines" with even the right of secession from the present national government. The literature fairly teems with such expressions as "confiscation," "revolution," "rebellion," and "violence," even distinguishing a "reformation" and advocating an "uprooting" in its stead. The jury were amply authorized to infer that violence was intended, and that the defendant did attempt to induce others to combine in such resistance to the lawful authority of the State.

In *Carr* v. *State,* 176 *Ga.* 55 (2), 63 (166 S. E. 827, 167 S. E. 103), this court said that "A combination of persons working together in a campaign with the intent and purpose to overthrow the present government of the United States or the States of the Federal Union, by the establishment of a proletarian dictatorship through resistance to the Federal government and by the smashing of the National Guard, can not be considered as an inoffensive, peaceful aggregation of citizens merely advising that course with the anticipation that the present government will quietly lay down its authority and embrace the principles and form of the proletarian dictatorship of Soviet Russia." This statement was in reference to the use of literature containing some of the expressions which are found in this record and quoted in the present opinion. In Gitlow *v.* People, 268 U. S. 652 (45 Sup. Ct. 625, 69 L. ed. 1138), the Supreme Court of the United States had for consideration a "Manifesto," which in tone and substance was similar to the documentary evidence in the instant case, and not stronger in its tendency to insurrection. In *Carr* v. *State,* supra, Mr. Justice Gilbert, speaking for this court, quoted at length from the decision in the Gitlow case. We now refer to the quotations there made as illustrating the opinion of the highest court on the nature and purport of such literature. Some of the language is so pertinent that we also take the liberty of quoting again, in part, as follows: "The Manifesto, plainly, is neither the statement of abstract doctrine nor, as suggested by counsel, mere prediction that industrial disturbances and revolutionary mass strikes will result spontaneously in an inevitable process of evolution in the economic system. It advocates and urges in

fervent language mass action which shall progressively foment industrial disturbances and through political mass strikes and revolutionary mass action overthrow and destroy organized parliamentary government. It concludes with a call to action in these words: 'The proletarian revolution and the Communist reconstruction of society—the struggle for these—is now indispensable. . . The Communist International calls the proletariat of the world to the final struggle!' This is not the expression of philosophical abstraction, the mere prediction of future events; it is the language of direct incitement. The means advocated for bringing about the destruction of organized parliamentary government, namely, mass industrial revolts usurping the functions of municipal government, political mass strikes directed against the parliamentary State, and revolutionary mass action for its final destruction, necessarily imply the use of force and violence, and in their essential nature are inherently unlawful in a constitutional government of law and order. That the jury were warranted in finding that the Manifesto advocated not merely the abstract doctrine of overthrowing organized government by force, violence, and unlawful means, but action to that end, is clear. . . That utterances inciting to the overthrow of organized government by unlawful means present a sufficient danger of substantive evil to bring their punishment within the range of legislative discretion, is clear. Such utterances, by their very nature, involve danger to the public peace and to the security of the State. They threaten breaches of the peace and ultimate revolution. And the immediate danger is none the less real and substantial because the effect of a given utterance can not be accurately foreseen. The State can not reasonably be required to measure the danger from every such utterance in the nice balance of a jeweler's scale. A single revolutionary spark may kindle a fire that, smouldering for a time, may burst into a sweeping and destructive conflagration. It can not be said that the State is acting arbitrarily or unreasonably when, in the exercise of its judgment as to the measures necessary to protect the public peace and safety, it seeks to extinguish the spark without waiting until it has enkindled the flame or blazed into the conflagration. It can not reasonably be required to defer the adoption of measures for its own peace and safety until the revolutionary utterances lead to actual disturb-

ances of the public peace or imminent and immediate danger of its own destruction; but it may, in the exercise of its judgment, suppress the threatened danger in its incipiency. In People *v.* Lloyd [304 Ill. 23, 34, 136 N. E. 505] it was aptly said: 'Manifestly, the legislature has authority to forbid the advocacy of a doctrine designed and intended to overthrow the government, without waiting until there is a present and imminent danger of the success of the plan advocated. If the State were compelled to wait until the apprehended danger became certain, then its right to protect itself would come into being simultaneously with the overthrow of the government, when there would be neither prosecuting officers nor courts for the enforcement of the law.'" See also Whitney *v.* California, 274 U. S. 357 (47 Sup. Ct. 641, 71 L. ed. 1095), and cit.

The evidence authorized the verdict, and the court did not err in refusing a new trial.

*Judgment affirmed. All the Justices concur, except Russell, C. J., absent because of illness.*