## HERNDON *v.* LOWRY, SHERIFF.

Nos. 474 and 475. Argued February 8, 1937.—Decided April 26, 1937.

*Mr. Whitney North Seymour,* with whom *Messrs. W. A. Sutherland, Herbert T. Wechsler,* and *Carol King* were on the brief, for appellant.

*Mr. J. Walter LeCraw,* Assistant Solicitor General of Georgia, with whom *Messrs. M. J. Yeomans,* Attorney General, and *John A. Boykin,* Solicitor General, were on the brief, for appellee.

MR. JUSTICE ROBERTS delivered the opinion of the Court.

The appellant claims his conviction in a state court deprived him of his liberty contrary to the guarantees of the Fourteenth Amendment. He assigns as error the action of the Supreme Court of Georgia in overruling his claim and refusing him a discharge upon *habeas corpus.* The petition for the writ, presented to the Superior Court of Fulton County, asserted the appellant was unlawfully detained by the appellee as sheriff under the supposed authority of a judgment pronouncing him guilty of attempting to incite insurrection, as defined in § 56 of the Penal Code, and sentencing him to imprisonment

for not less than eighteen nor more than twenty years. Attached were copies of the judgment and the indictment and a statement of the evidence upon which the verdict and judgment were founded. The petition alleged the judgment and sentence were void and appellant's detention illegal because the statute under which he was convicted denies and illegally restrains his freedom of speech and of assembly and is too vague and indefinite to provide a sufficiently ascertainable standard of guilt, and further alleged that there had been no adjudication by any court of the constitutional validity of the statute as applied to appellant's conduct. A writ issued. The appellee answered, demurred specially to, and moved to strike, so much of the petition as incorporated the evidence taken at the trial. At the hearing the statement of the evidence was identified and was conceded by the appellee to be full and accurate. The court denied the motion to strike, overruled the special demurrer and an objection to the admission of the trial record, decided that the statute, as construed and applied in the trial of the appellant, did not infringe his liberty of speech and of assembly but ran afoul of the Fourteenth Amendment because too vague and indefinite to provide a sufficiently ascertainable standard of guilt, and ordered the prisoner's discharge from custody. The appellee took the case to the Supreme Court of Georgia, assigning as error the ruling upon his demurrer, motion, and objection, and the decision against the validity of the statute. The appellant, in accordance with the state practice, also appealed, assigning as error the decision with respect to his right of free speech and of assembly. The two appeals were separately docketed but considered in a single opinion which reversed the judgment on the appellee's appeal and affirmed on that of the appellant,[1] concluding: "Under

---

[1] 182 Ga. 582; 186 S. E. 429.

the pleadings and the evidence, which embraced the record on the trial that resulted in the conviction, the court erred, in the *habeas corpus* proceeding, in refusing to remand the prisoner to the custody of the officers."

The federal questions presented, and the manner in which they arise, appear from the record of appellant's trial and conviction embodied in the petition, and from the opinions of the State Supreme Court in the criminal proceeding.

At the July Term 1932 of the Superior Court of Fulton County an indictment was returned charging against the appellant an attempt to induce others to join in combined resistance to the lawful authority of the state with intent to deny, to defeat, and to overthrow such authority by open force, violent means, and unlawful acts; alleging that insurrection was intended to be manifested and accomplished by unlawful and violent acts. The indictment specified that the attempt was made by calling and attending public assemblies and by making speeches for the purpose of organizing and establishing groups and combinations of white and colored persons under the name of the Communist Party of Atlanta for the purpose of uniting, combining, and conspiring to incite riots and to embarrass and impede the orderly processes of the courts and offering combined resistance to, and, by force and violence, overthrowing and defeating the authority of the state; that by speech and persuasion, the appellant solicited and attempted to solicit persons to join, confederate with, and become members of the Communist Party and the Young Communist League and introduced into the state and circulated, aided and assisted in introducing and circulating, booklets, papers, and other writings with the same intent and purpose. The charge was founded on § 56 of the Penal Code, one of four related sections. Section 55 defines insurrection, § 56 defines an attempt to incite insurrection, § 57 prescribes the death

penalty for conviction of the offenses described in the two preceding sections unless the jury shall recommend mercy, and § 58 penalizes, by imprisonment, the introduction and circulation of printed matter for the purpose of inciting insurrection, riot, conspiracy, etc. The sections are copied in the margin.[2]

The appellant was brought to trial and convicted. He appealed on the ground that, under the statute as construed by the trial court in its instructions to the jury, there was no evidence to sustain a verdict of guilty. The Supreme Court affirmed the judgment upon a broader and different construction of the Act.[3] The appellant moved for a rehearing, contending, *inter alia*, that, as so construed, the statute violated the Fourteenth Amendment. The court refused to pass upon the constitutional questions thus raised, elaborated and explained its construction of the statute in its original opinion, and de-

---

[2] "55. Insurrection shall consist in any combined resistance to the lawful authority of the State, with intent to the denial thereof, when the same is manifested or intended to be manifested by acts of violence.

"56. Any attempt, by persuasion or otherwise, to induce others to join in any combined resistance to the lawful authority of the State shall constitute an attempt to incite insurrection.

"57. Any person convicted of the offense of insurrection, or an attempt to incite insurrection, shall be punished with death; or, if the jury recommend to mercy, confinement in the penitentiary for not less than five nor more than 20 years.

"58. If any person shall bring, introduce, print, or circulate, or cause to be introduced, circulated, or printed, or aid or assist, or be in any manner instrumental in bringing, introducing, circulating, or printing within this State any paper, pamphlet, circular, or any writing, for the purpose of inciting insurrection, riot, conspiracy, or resistance against the lawful authority of the State, or against the lives of the inhabitants thereof, or any part of them, he shall be punished by confinement in the penitentiary for not less than five nor longer than 20 years." (Georgia Code, 1933, §§ 26–901 to 26–904, inclusive.)

[3] *Herndon* v. *State*, 178 Ga. 832; 174 S. E. 597.

nied a rehearing.[4]   The appellant perfected an appeal to this court claiming that he had timely raised the federal questions and we, therefore, had jurisdiction to decide them.   We held we were without jurisdiction.[5]   Upon his commitment to serve his sentence he sought the writ of *habeas corpus.*

In the present proceeding the Superior Court and Supreme Court of Georgia have considered and disposed of the contentions based upon the Federal Constitution.   The scope of a *habeas corpus* proceeding in the circumstances disclosed is a state and not a federal question and since the state courts treated the proceeding as properly raising issues of federal constitutional right, we have jurisdiction and all such issues are open here.   We must, then, inquire whether the statute as applied in the trial denied appellant rights safeguarded by the Fourteenth Amendment.

The evidence on which the judgment rests consists of appellant's admissions and certain documents found in his possession.   The appellant told the state's officers that some time prior to his arrest he joined the Communist Party in Kentucky and later came to Atlanta as a paid organizer for the party, his duties being to call meetings, to educate and disseminate information respecting the party, to distribute literature, to secure members, and to work up an organization of the party in Atlanta; and that he had held or attended three meetings called by him.   He made no further admission as to what he did as an organizer, or what he said or did at the meetings.   When arrested he carried a box containing documents.   After he was arrested he conducted the officers to his room where additional documents and bundles of newspapers and periodicals were found, which

---

[4] *Herndon* v. *State,* 179 Ga. 597;  176 S. E. 620.

[5] *Herndon* v. *Georgia,* 295 U. S. 441.

he stated were sent him from the headquarters of the Communist Party in New York. He gave the names of persons who were members of the organization in Atlanta, and stated he had only five or six actual members at the time of his apprehension. The stubs of membership books found in the box indicated he had enrolled more members than he stated. There was no evidence that he had distributed any of the material carried on his person and found in his room, or had taken any of it to meetings, save two circulars or appeals respecting county relief which are confessedly innocuous.

The newspapers, pamphlets, periodicals, and other documents found in his room were, so he stated, intended for distribution at his meetings. These the appellee concedes were not introduced in evidence. Certain documents in his possession when he was arrested were placed in evidence. They fall into five classes: first, receipt books showing receipts of small sums of money, pads containing certificates of contributions to the Communist Party's Presidential Election Campaign Fund, receipts for rent of a post office box, and Communist Party membership books; secondly, printed matter consisting of magazines, pamphlets, and copies of the "Daily Worker," styled the "Central Organ of the Communist Party," and the "Southern Worker," also, apparently, an official newspaper of the party; thirdly, two books, one "Life and Struggles of Negro Toilers," by George Padmore, and the other "Communism and Christianism Analyzed and Contrasted from the Marxian and Darwinian Points of View" by Rt. Rev. William Montgomery Brown, D. D.; fourthly, transcripts of minutes of meetings apparently held in Atlanta; fifthly, two circulars, one of which was prepared by the appellant and both of which had been circulated by him in Fulton County. All of these may be dismissed as irrelevant except those falling within the first and second

groups. No inference can be drawn from the possession of the books mentioned, either that they embodied the doctrines of the Communist Party or that they represented views advocated by the appellant. The minutes of meetings contain nothing indicating the purposes of the organization or any intent to overthrow organized government; on the contrary, they indicate merely discussion of relief for the unemployed. The two circulars, admittedly distributed by the appellant, had nothing to do with the Communist Party, its aims or purposes, and were not appeals to join the party but were concerned with unemployment relief in the county and included appeals to the white and negro unemployed to organize and represent the need for further county aid. They were characterized by the Supreme Court of Georgia as "more or less harmless."

The documents of the first class disclose the activity of the appellant as an organizer but, in this respect, add nothing to his admissions.

The matter appearing upon the membership blanks is innocent upon its face however foolish and pernicious the aims it suggests. Under the heading "What is the Communist Party?" this appears:

"The Party is the vanguard of the working class and consists of the best, most class conscious, most active, the most courageous members of that class. It incorporates the whole body of experience of the proletarian struggle, basing itself upon the revolutionary theory of Marxism and representing the general and lasting interests of the whole of the working class, the Party personifies the unity of proletarian principles, of proletarian will and of proletarian revolutionary action.

"We are the Party of the working class. Consequently, nearly the whole of that class (in time of war and civil war, the whole of that class) should work under the guidance of our Party, should create the closest contacts with our Party."

This vague declaration falls short of an attempt to bring about insurrection either immediately or within a reasonable time but amounts merely to a statement of ultimate ideals. The blanks, however, indicate more specific aims for which members of the Communist Party are to vote. They are to vote Communist for

"1. Unemployment and Social Insurance at the expense of the State and employers.

"2. Against Hoover's wage-cutting policy.

"3. Emergency relief for the poor farmers without restrictions by the government and banks; exemption of poor farmers from taxes and from forced collection of rents or debts.

"4. Equal rights for the Negroes and self-determination for the Black Belt.

"5. Against capitalistic terror: against all forms of suppression of the political rights of the workers.

"6. Against imperialist war; for the defense of the Chinese people and of the Soviet Union."

None of these aims is criminal upon its face. As to one, the 4th, the claim is that criminality may be found because of extrinsic facts. Those facts consist of possession by appellant of booklets and other literature of the second class illustrating the party doctrines. The State contends these show that the purposes of the Communist Party were forcible subversion of the lawful authority of Georgia. They contain, *inter alia,* statements to the effect that the party bases itself upon the revolutionary theory of Marxism, opposes "bosses' wars," approves of the Soviet Union, and desires the "smashing" of the National Guard, the C. M. T. C., and the R. O. T. C. But the State especially relies upon a booklet entitled "The Communist Position on the Negro Question," on the cover of which appears a map of the United States having a dark belt across certain Southern states and the

phrase "Self-Determination for the Black Belt." The booklet affirms that the source of the Communist slogan "Right of Self-Determination of the Negroes in the Black Belt" is a resolution of the Communist International on the Negro question in the United States adopted in 1930, which states that the Communist Party in the United States has been actively attempting to win increasing sympathy among the negro population, that certain things have been advocated for the benefit of the Negroes in the Northern states, but that in the Southern portion of the United States the Communist slogan must be "The Right of Self-Determination of the Negroes in the Black Belt." The resolution defines the meaning of the slogan as

"(a) Confiscation of the landed property of the white landowners and capitalists for the benefit of the negro farmers . . . Without this revolutionary measure, without the agrarian revolution, the right of self-determination of the Negro population would be only a Utopia or, at best, would remain only on paper without changing in any way the actual enslavement."

"(b) Establishment of the State Unity of the Black Belt . . . If the right of self-determination of the Negroes is to be put into force, it is necessary wherever possible to bring together into one governmental unit all districts of the South where the majority of the settled population consists of negroes . . ."

"(c) Right of Self-Determination. This means complete and unlimited right of the negro majority to exercise governmental authority in the entire territory of the Black Belt, as well as to decide upon the relations between their territory and other nations, particularly the United States . . . First of all, true right to self-determination means that the negro majority and not the white minority in the entire territory of the administratively

united Black Belt exercises the right of administering governmental, legislative, and judicial authority. At the present time all this power is concentrated in the hands of the white bourgeoisie and landlords. It is they who appoint all officials, it is they who dispose of public property, it is they who determine the taxes, it is they who govern and make the laws. Therefore, the overthrow of this class rule in the Black Belt is unconditionally necessary in the struggle for the negroes' right to self-determination. This, however, means at the same time the overthrow of the yoke of American imperialism in the Black Belt on which the forces of the local white bourgeoisie depend. Only in this way, only if the negro population of the Black Belt wins its freedom from American imperialism even to the point of deciding itself the relations between its country and other governments, especially the United States, will it win real and complete self-determination. One should demand from the beginning that no armed forces of American imperialism should remain on the territory of the Black Belt."

Further statements appearing in the pamphlet are:

"Even if the situation does not yet warrant the raising of the question of uprising, one should not limit oneself at present to propaganda for the demand, 'Right to Self-Determination,' but should organize mass actions, such as demonstrations, strikes, tax boycott movements, etc."

"One cannot deny that it is just possible for the negro population of the Black Belt to win the right to self-determination during capitalism; but it is perfectly clear and indubitable that this is possible only through successful revolutionary struggle for power against the American bourgeoisie, through wresting the negroes' right of self-determination from American imperialism. Thus, the slogan of right to self-determination is a real slogan of National Rebellion which, to be considered as such, need

not be supplemented by proclaiming struggle for the complete separation of the negro zone, at least not at present."

There is more of the same purport, particularly references to the "revolutionary trade unions in the South," "revolutionary struggle against the ruling white bourgeoisie," and "revolutionary program of the Communist Party."

There is no evidence the appellant distributed any writings or printed matter found in the box he carried when arrested, or any other advocating forcible subversion of governmental authority. There is no evidence the appellant advocated, by speech or written word, at meetings or elsewhere, any doctrine or action implying such forcible subversion. There is evidence tending to prove that the appellant held meetings for the purpose of recruiting members of the Communist Party and solicited contributions for the support of that party and there is proof of the doctrines which that party espouses. Appellant's intent to incite insurrection, if it is to be found, must rest upon his procuring members for the Communist Party and his possession of that party's literature when he was arrested.

Section 55 of the Georgia Penal Code defines insurrection as "combined resistance to the lawful authority of the State, with intent to the denial thereof, when the same is manifested or intended to be manifested by acts of violence." [6]  The appellant was not indicted under this section. Section 58 denounces the introduction, printing, or circulation, or assisting to print or circulate any document "for the purpose of inciting insurrection." The appellant was not indicted under this section.

Section 56, under which the indictment is laid, makes no reference to force or violence except by the phrase

---

[6] Note 2, *supra.*

"combined resistance to the lawful authority of the State." The Supreme Court evidently importing from the similar phraseology in § 55 the additional element contained in that section, namely, "manifested or intended to be manifested by acts of violence," has decided that intended resort to force is an essential element of the offense defined by § 56.

To ascertain how the Act is held to apply to the appellant's conduct we turn to the rulings of the state courts in his case. The trial court instructed the jury: "In order to convict the defendant, . . . it must appear clearly by the evidence that immediate serious violence against the State of Georgia was to be expected or advocated." The jury rendered a verdict of guilty. In the Supreme Court the appellant urged that the evidence was wholly insufficient to sustain the verdict under the law as thus construed. That court sustained the conviction by construing the statute thus:

"Force must have been contemplated, but, as said above, the statute does not include either its occurrence or its imminence as an ingredient of the particular offense charged. . . . Nor would it be necessary to guilt that the alleged offender should have intended that an insurrection should follow instantly or at any given time, but it would be sufficient that he intended it to happen at any time, as a result of his influence, by those whom he sought to incite." [7]

Upon application for rehearing the court further elaborated its views as to the meaning of the statute:

"Force must have been contemplated, but the statute does not include either its occurrence or its imminence as an ingredient of the particular offense charged. Nor would it be necessary to guilt that the alleged offender

---

[7] 178 Ga. 855, 174 S. E. 597.

should have intended that an insurrection should follow instantly or at any given time, but as to this element it would be sufficient if he intended that it should happen at any time within which he might reasonably expect his influence to continue to be directly operative in causing such action by those whom he sought to induce. . . ." [8]

The affirmance of conviction upon the trial record necessarily gives § 56 the construction that one who seeks members for or attempts to organize a local unit of a party which has the purposes and objects disclosed by the documents in evidence may be found guilty of an attempt to incite insurrection.

The questions are whether this construction and application of the statute deprives the accused of the right of freedom of speech and of assembly guaranteed by the Fourteenth Amendment, and whether the statute so construed and applied furnishes a reasonably definite and ascertainable standard of guilt.

The appellant, while admitting that the people may protect themselves against abuses of the freedom of speech safeguarded by the Fourteenth Amendment by prohibiting incitement to violence and crime, insists that legislative regulation may not go beyond measures forefending against "clear and present danger" of the use of force against the state. For this position he relies upon our decisions under the Federal Espionage Acts [9] and cognate state legislation. These made it criminal wilfully to cause or to attempt to cause, or incite or attempt to incite, insubordination, disloyalty, mutiny or refusal of duty in the military or naval forces of the United States or wilfully to obstruct or attempt to obstruct the recruiting or enlistment service of the United States or to con-

---

[8] 179 Ga. 600, 176 S. E. 622.

[9] Act of June 15, 1917, c. 30, 40 Stat. 217, 219; amended by Act of May 16, 1918, c. 75, 40 Stat. 553.

spire for these purposes. We sustained the power of the government or a state to protect the war operations of the United States by punishing intentional interference with them. We recognized, however, that words may be spoken or written for various purposes and that wilful and intentional interference with the described operations of the government might be inferred from the time, place, and circumstances of the act. "The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree." [10]

The legislation under review differs radically from the Espionage Acts in that it does not deal with a wilful attempt to obstruct a described and defined activity of the government.

The State, on the other hand, insists that our decisions uphold state statutes making criminal utterances which have a "dangerous tendency" towards the subversion of government. It relies particularly upon *Gitlow* v. *New York*, 268 U. S. 652. There, however, we dealt with a statute which, quite unlike § 56 of the Georgia Criminal Code, denounced as criminal certain acts carefully and adequately described. We said:

"And a State may penalize utterances which openly advocate the overthrow of the representative and constitutional form of government of the United States and the several States, by violence or other unlawful means." (p. 668.)

---

[10] See *Schenck* v. *United States*, 249 U. S. 47, 52; *Frohwerk* v. *United States*, 249 U. S. 204; *Debs* v. *United States*, 249 U. S. 211; *Abrams* v. *United States*, 250 U. S. 616; *Schaefer* v. *United States*, 251 U. S. 466; *Pierce* v. *United States*, 252 U. S. 239; *O'Connell* v. *United States*, 253 U. S. 142; *State* v. *Holm*, 139 Minn. 267; 166 N. W. 181; *Gilbert* v. *Minnesota*, 254 U. S. 325.

"By enacting the present statute the State has determined, through its legislative body, that utterances advocating the overthrow of organized government by force, violence and unlawful means, are so inimical to the general welfare and involve such danger of substantive evil that they may be penalized in the exercise of its police power. That determination must be given great weight. Every presumption is to be indulged in favor of the validity of the statute. *Mugler* v. *Kansas*, 123 U. S. 623, 661. And the case is to be considered 'in the light of the principle that the State is primarily the judge of regulations required in the interest of public safety and welfare;' and that its police 'statutes may only be declared unconstitutional where they are arbitrary or unreasonable attempts to exercise authority vested in the State in the public interest.'" (p. 668.)

And it was in connection with the statute there involved that the court quoted language relied upon below and in argument here from *People* v. *Lloyd*, 304 Ill. 23; 136 N. E. 505, to the effect that a state is not compelled to delay adoption of such preventive measures until the apprehended danger becomes certain. Out of excess of caution the distinction was again clearly drawn between acts of the order of the Espionage Act and the New York act under review.

". . . when the legislative body has determined generally, in the constitutional exercise of its discretion, that utterances of a certain kind involve such danger of substantive evil that they may be punished, the question whether any specific utterance coming within the prohibited class is likely, in and of itself, to bring about the substantive evil, is not open to consideration. It is sufficient that the statute itself be constitutional and that the use of the language comes within its prohibition.

"It is clear that the question in such cases is entirely different from that involved in those cases where the

statute merely prohibits certain acts involving the danger of substantive evil, without any reference to language itself, and it is sought to apply its provisions to language used by the defendant for the purpose of bringing about the prohibited results. There, if it be contended that the statute cannot be applied to the language used by the defendant because of its protection by the freedom of speech or press, it must necessarily be found, as an original question, without any previous determination by the legislative body, whether the specific language used involved such likelihood of bringing about the substantive evil as to deprive it of the constitutional protection." (pp. 670–671.)

It is evident that the decision sustaining the New York statute furnishes no warrant for the appellee's contention that under a law general in its description of the mischief to be remedied and equally general in respect of the intent of the actor, the standard of guilt may be made the "dangerous tendency" of his words.

The power of a state to abridge freedom of speech and of assembly is the exception rather than the rule and the penalizing even of utterances of a defined character must find its justification in a reasonable apprehension of danger to organized government. The judgment of the legislature is not unfettered. The limitation upon individual liberty must have appropriate relation to the safety of the state. Legislation which goes beyond this need violates the principle of the Constitution. If, therefore, a state statute penalize innocent participation in a meeting held with an innocent purpose merely because the meeting was held under the auspices of an organization membership in which, or the advocacy of whose principles, is also denounced as criminal, the law, so construed and applied, goes beyond the power to restrict abuses of freedom

of speech and arbitrarily denies that freedom.[11]   And, where a statute is so vague and uncertain as to make criminal an utterance or an act which may be innocently said or done with no intent to induce resort to violence or on the other hand may be said or done with a purpose violently to subvert government, a conviction under such a law cannot be sustained.   Upon this view we held bad a statute of California providing that "Any person who displays a red flag,   .   .   .   in any public place or in any meeting place or public assembly, or from or on any house, building or window as a sign, symbol or emblem of opposition to organized government   .   .   .   is guilty of a felony." [12]

After pointing out that peaceful agitation for a change of our form of government is within the guaranteed liberty of speech, we said of the act in question: "A statute which upon its face, and as authoritatively construed, is so vague and indefinite as to permit the punishment of the fair use of this opportunity is repugnant to the guaranty of liberty contained in the Fourteenth Amendment." (p. 369.)

■ The appellant had a constitutional right to address meetings and organize parties unless in so doing he violated some prohibition of a valid statute.   The only prohibition he is said to have violated is that of § 56 forbidding incitement or attempted incitement to insurrection by violence.   If the evidence fails to show that he did so incite, then, as applied to him, the statute unreasonably limits freedom of speech and freedom of assembly and violates the Fourteenth Amendment.   We are of opinion that the requisite proof is lacking.   From what has been said above with respect to the evidence offered at

---

[11] *DeJonge* v. *Oregon,* 299 U. S. 353.

[12] *Stromberg* v. *California,* 283 U. S. 359.

the trial it is apparent that the documents found upon the appellant's person were certainly, as to some of the aims stated therein, innocent and consistent with peaceful action for a change in the laws or the constitution. The proof wholly fails to show that the appellant had read these documents; that he had distributed any of them; that he believed and advocated any or all of the principles and aims set forth in them, or that those he had procured to become members of the party knew or approved of any of these documents.

Thus, the crucial question is not the formal interpretation of the statute by the Supreme Court of Georgia but the application given it. In its application the offense made criminal is that of soliciting members for a political party and conducting meetings of a local unit of that party when one of the doctrines of the party, established by reference to a document not shown to have been exhibited to anyone by the accused, may be said to be ultimate resort to violence at some indefinite future time against organized government. It is to be borne in mind that the legislature of Georgia has not made membership in the Communist Party unlawful by reason of its supposed dangerous tendency even in the remote future. The question is not whether Georgia might, in analogy to what other states have done, so declare.[18] The appellant induced others to become members of the Communist Party. Did he thus incite to insurrection by reason of the fact that they agreed to abide by the tenets of the party, some of them lawful, others, as may be assumed, unlawful, in the absence of proof that he brought the unlawful aims to their notice, that he approved them, or that the fantastic program

---

[18] See the statutes drawn in question in *Gitlow* v. *New York*, 268 U. S. 652, at 654, and in *Whitney* v. *California*, 274 U. S. 357, 359.

they envisaged was conceived of by anyone as more than an ultimate ideal? Doubtless circumstantial evidence might affect the answer to the question if appellant had been shown to have said that the Black Belt should be organized at once as a separate state and that that objective was one of his principal aims. But here circumstantial evidence is all to the opposite effect. The only objectives appellant is proved to have urged are those having to do with unemployment and emergency relief which are void of criminality. His membership in the Communist Party and his solicitation of a few members wholly fails to establish an attempt to incite others to insurrection. Indeed, so far as appears, he had but a single copy of the booklet the State claims to be objectionable; that copy he retained. The same may be said with respect to the other books and pamphlets, some of them of more innocent purport. In these circumstances, to make membership in the party and solicitation of members for that party a criminal offense, punishable by death, in the discretion of a jury, is an unwarranted invasion of the right of freedom of speech.

■ The statute, as construed and applied in the appellant's trial, does not furnish a sufficiently ascertainable standard of guilt. The Act does not prohibit incitement to violent interference with any given activity or operation of the state. By force of it, as construed, the judge and jury trying an alleged offender cannot appraise the circumstances and character of the defendant's utterances or activities as begetting a clear and present danger of forcible obstruction of a particular state function. Nor is any specified conduct or utterance of the accused made an offense.

The test of guilt is thus formulated by the Supreme Court of the state. Forcible action must have been contemplated but it would be sufficient to sustain a con-

viction if the accused intended that an insurrection "should happen at any time within which he might reasonably expect his influence to continue to be directly operative in causing such action by those whom he sought to induce." If the jury conclude that the defendant should have contemplated that any act or utterance of his in opposition to the established order or advocating a change in that order, might, in the distant future, eventuate in a combination to offer forcible resistance to the State, or as the State says, if the jury believe he should have known that his words would have "a dangerous tendency" then he may be convicted. To be guilty under the law, as construed, a defendant need not advocate resort to force. He need not teach any particular doctrine to come within its purview. Indeed, he need not be active in the formation of a combination or group if he agitate for a change in the frame of government, however peaceful his own intent. If, by the exercise of prophesy, he can forecast that, as a result of a chain of causation, following his proposed action a group may arise at some future date which will resort to force, he is bound to make the prophesy and abstain, under pain of punishment, possibly of execution. Every person who attacks existing conditions, who agitates for a change in the form of government, must take the risk that if a jury should be of opinion he ought to have foreseen that his utterances might contribute in any measure to some future forcible resistance to the existing government he may be convicted of the offense of inciting insurrection. Proof that the accused in fact believed that his effort would cause a violent assault upon the state would not be necessary to conviction. It would be sufficient if the jury thought he reasonably might foretell that those he persuaded to join the party might, at some time in the indefinite future, resort to forcible resistance of

government. The question thus proposed to a jury involves pure speculation as to future trends of thought and action. Within what time might one reasonably expect that an attempted organization of the Communist Party in the United States would result in violent action by that party? If a jury returned a special verdict saying twenty years or even fifty years the verdict could not be shown to be wrong. The law, as thus construed, licenses the jury to create its own standard in each case. In this aspect what was said in *United States* v. *Cohen Grocery Co.*, 255 U. S. 81, is particularly apposite:

"Observe that the section forbids no specific or definite act. It confines the subject-matter of the investigation which it authorizes to no element essentially inhering in the transaction as to which it provides. It leaves open, therefore, the widest conceivable inquiry, the scope of which no one can foresee and the result of which no one can foreshadow or adequately guard against. In fact, we see no reason to doubt the soundness of the observation of the court below, in its opinion, to the effect that, to attempt to enforce the section would be the exact equivalent of an effort to carry out a statute which in terms merely penalized and punished all acts detrimental to the public interest when unjust and unreasonable in the estimation of the court and jury . . ." (p. 89.)

The decisions relied on by the State held the Sherman Law furnished a reasonable standard of guilt because it made a standard long recognized by the common law the statutory test.[14]

The statute, as construed and applied, amounts merely to a dragnet which may enmesh anyone who agitates for a change of government if a jury can be persuaded that he ought to have foreseen his words would have some

---

[14] *Waters-Pierce Oil Co.* v. *Texas*, 212 U. S. 86; *Nash* v. *United States*, 229 U. S. 373.

264

effect in the future conduct of others. No reasonably ascertainable standard of guilt is prescribed. So vague and indeterminate are the boundaries thus set to the freedom of speech and assembly that the law necessarily violates the guarantees of liberty embodied in the Fourteenth Amendment.

The judgment is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

*Reversed.*

MR. JUSTICE VAN DEVANTER, dissenting.

I am of opinion that the Georgia statute, as construed and applied by the supreme court of the State in Herndon's case, prescribes a reasonably definite and ascertainable standard by which to determine the guilt or innocence of the accused, and does not encroach on his right of freedom of speech or of assembly.

It plainly appears, I think, that the offense defined in the statute, and of which Herndon was convicted, was not that of advocating a change in the state government by lawful means, such as an orderly exertion of the elective franchise or of the power to amend the state constitution, but was that of attempting to induce and incite others to join in combined *forcible* resistance to the lawful authority of the State.

Sections 55, 56 and 57 of the Penal Code of Georgia [1] deal with insurrection, attempts to incite insurrection, and the punishment therefor, and are so closely related that all evidently have a bearing on the scope and meaning of any one of them. Section 55 denounces insurrection and defines it as "any combined resistance to the lawful authority of the State, with intent to the denial thereof, when the same is manifested or intended to be manifested by acts of violence." Section 56 denounces

[1] Georgia Code 1933. §§ 26–901, 26–902, 26–903.

an attempt to incite insurrection and defines it as "any attempt, by persuasion or otherwise, to induce others to join in any combined resistance to the lawful authority of the State." Section 57 prescribes the punishment for each of these offenses.

While § 56 does not in direct terms include force or violence as a feature of the "combined resistance to the lawful authority of the State" the attempt to induce which it denounces, the supreme court of the State has construed the section, doubtless by reason of its relation to the others, as making intended resort to force or violence an essential element of such "combined resistance." [2] Therefore the section must be taken as if expressly embodying this construction. It was under § 56 that Herndon was indicted, tried and convicted.

By the indictment he was charged with attempting to induce others to join in combined resistance to the lawful authority of the State "by open force and by violent means, and by unlawful acts," the modes of attempted inducement being specified. Upon the trial the court instructed the jury that neither "possession of literature insurrectionary in its nature" nor "engaging in academic or philosophical discussion of abstract principles of economics or political or other subjects, however radical or revolutionary in their nature," would warrant a conviction; and that a verdict of guilt could not be given unless it clearly appeared from the evidence that "immediate serious violence against the State" was expected or advocated by the accused.

In affirming the conviction the supreme court of the State held that under the statute "force must have been contemplated," but that it is not necessary to guilt that the accused "should have intended that an insurrection

---

[2] *Carr* v. *State,* 176 Ga. 747; 169 S. E. 201; *Herndon* v. *State,* 178 Ga. 832, 855; 174 S. E. 597.

should follow instantly or at any given time, but it would be sufficient that he intended it to happen at any time, as a result" of his persuasion—the intent of the statute being "to arrest at its incipiency any effort to overthrow the state government, where it takes the form of an actual attempt to incite others to insurrection."

Then, coming to consider the sufficiency of the evidence, the supreme court stated: "From what has been said, the question here is simply this: did the evidence show that the defendant made any attempt to induce others to come together in any combined *forcible* resistance to the lawful authority of the State?" And the court concluded its consideration of this question by saying, "The jury were amply authorized to infer that *violence* was intended and that the defendant did attempt to induce others to combine in *such* resistance to the lawful authority of the State." (Italics supplied.)[3]

The accused sought a rehearing, largely because of his understanding of what was said in the court's opinion respecting the expected time of the intended resort to force. A rehearing was denied, and in that connection the court said:[4]

"The language used by this court should be considered with the usual reasonable implications. The phrase 'at any time,' as criticized in the motion for rehearing, was not intended to mean at any time in the indefinite future, or at any possible later time, however remote. An activity now could hardly be expected to be the direct producing cause of an insurrection after the lapse of a great period of time, and it was not the purpose of this court to suggest that as to the mental requisite any such intent would be a sufficient ingredient of an attempt to incite an insurrection. On the contrary the phrase 'at

---

[3] *Herndon* v. *State*, 178 Ga. 832, 855, 867; 174 S. E. 597.

[4] *Herndon* v. *State*, 179 Ga. 597, 599; 176 S. E. 620.

any time' was necessarily intended, and should have been understood, to mean within a reasonable time; that is, within such time as one's persuasion or other adopted means might reasonably be expected to be directly operative in causing an insurrection. Accordingly, the statements by this court as quoted in the motion for rehearing are to be accepted in the following sense: *Force must have been contemplated,* but the statute does not include either its occurrence or its imminence as an ingredient of the particular offense charged. Nor would it be necessary to guilt that the alleged offender should have intended that an insurrection should follow instantly or at any given time, but as to this element it would be sufficient if he intended that it should happen at any time within which he might reasonably expect his influence to continue to be directly operative in causing such action by those whom he sought to induce. This statement, considered with what was said in the original decision, represents the view of this court as to the proper construction of the statute under consideration; *and under the statute as thus interpreted, we say, as before, that the evidence was sufficient to authorize the conviction.* In view of what has been said above, it would seem that all contentions made in the motion for rehearing should necessarily fail, based, as they are, upon an erroneous construction of our decision." (Italics supplied.)

It thus is made quite plain that the case proceeded from beginning to end, and in both state courts, upon the theory that the offense denounced by the statute and charged in the indictment was that of attempting to induce and incite others to join in combined *forcible* resistance to the lawful authority of the State; that the jury returned a verdict of guilty upon that theory; and that it was upon the same theory that the supreme court held

the jury's verdict was supported by the evidence, and affirmed the conviction.

The present appeal is not from that judgment of affirmance but from a judgment denying a subsequent petition for *habeas corpus*.[5]

If it be assumed that on this appeal the evidence produced on the trial in the criminal case may be examined to ascertain how the statute was applied, I am of opinion, after such an examination, that the statute was applied as if the words "combined resistance" therein were in letter and meaning "combined forcible resistance."

The evidence, all of which is embodied in the present record, will be here stated in reduced volume without omitting anything material.

Herndon is a negro and a member of the Communist Party of the U. S. A., which is a section of the Communist International. He was sent from Kentucky to Atlanta, Georgia, as a paid organizer for the party. Atlanta is within an area where there is a large negro population, and the Communist Party has been endeavoring to extend its activities and membership to that population among others. Herndon's duties as an organizer were to call and conduct meetings, to disseminate information respecting the party, to distribute its literature, to educate prospects and secure members, to receive dues and contributions, and to work up a subordinate organization of the party. He called and conducted meetings which evidently were secret, solicited and secured members, and received dues and contributions. He and others, when becoming members, subscribed to an obligation saying "The undersigned declares his adherence to the program and statutes of the Communist International and the Communist Party of the

---

[5] *Lowry* v. *Herndon,* 182 Ga. 582; 186 S. E. 429.

U. S. A., and agrees to submit to the discipline of the party and to engage actively in its work."

When arrested he had under his arm a box in which he was carrying membership and collection books which he had been using and various pamphlets, books and documents, all pertaining to the structure, purposes and activities of the party. Two or three of the papers had been prepared by him and disclosed that he was an active spirit in the "Section Committee" and the "Unemployment Committee," both subordinate local agencies of the party. The membership books, besides showing names of those whom he had induced to become members and dates of their admission, contained extracts from the party statutes, some of which read:

"A member of the Party can be every person from the age of eighteen up who accepts the program and statutes of the Communist International and the Communist Party of the U. S. A., who becomes a member of a basic organization of the Party, who is active in this organization, who subordinates himself to all decisions of the Comintern and of the Party, and regularly pays his membership dues."

"The strictest Party Discipline is the most solemn duty of all Party members and all Party organizations. The decisions of the CI and the Party Convention of the CC and of all leading committees of the Party, must be promptly carried out. Discussion of questions over which there have been differences must not continue after the decision has been made."

"The Party is the vanguard of the working class and consists of the best, most class conscious, most active, the most courageous members of that class. It incorporates the whole body of experience of the proletarian struggle, basing itself upon the *revolutionary theory of Marxism* and representing the general and lasting interests of the

whole of the working class. The Party personifies the unity of proletarian principles, of proletarian will and of proletarian revolutionary action."

The collection books contained the statement "Every dollar collected is a bullet fired into the boss class."

The membership and collection books had been sent to Herndon from the main office of the party in New York for use by him, and he had been using them in securing members and in collecting dues and contributions. With the exception of two or three papers prepared by him and heretofore mentioned, the literature which he was carrying under his arm when arrested had been sent to him from the same office, together with many pamphlets, books and other publications, for use and distribution by him in his work as an organizer. The literature which he had with him when arrested was produced in evidence and will now be described, chiefly by titles and extracts (italics supplied).

### "Appeal to Southern Young Workers."

"The Young Communist League is the champion not only of the young white workers but especially of the doubly oppressed negro young workers. The Young Communist League fights against the whole system of race discrimination and stands for full racial, political, economic and social equality of all workers. . . .

"The chief aim of the Young Communist League is to organize the young workers for a struggle against the bosses and against the whole profit system.

.        .        .        .        .

"The Young Communist League fights for:

.        .        .        .        .

"Full political, social and racial equality for the negro workers.

"Against bosses' wars!   Defend the Soviet Union!

"*Smash the National Guard, the C. M. T. C. and R. O. T. C.*"

### "Life and Struggles of Negro Toilers."

"In no other so-called civilized country in the world are human beings treated as badly as these 15 million negroes [in the United States]. They live under a perpetual regime of white terror. . . . They are absolutely at the mercy of every fiendish mob incited by the white landlords and capitalists."

### "Communism and Christianism."

"Banish the Gods from the Skies and Capitalists from the Earth and make the World safe for Industrial Communism.

.      .      .      .      .

"The trouble with every reformatory socialism of modern times is, that it undertakes the impossibility of changing the fruit of the capitalist state into that of the communistic one, without changing the political organism; but to do that is as impossible as to gather grapes from thorns or figs from thistles. Hence an uprooting and replanting are necessary (*a revolution not a reformation*) which will give the world a new tree of state.

"Capitalism no longer grows the fruits (foods, clothes and houses) which are necessary to the sustenance of all the world. Hence it must be *dug up by the roots* in order that a tree which is so organized that it will bear these necessities for the whole world may be *planted in its place*.

"The people of Russia have accomplished this *uprooting and replanting* (this *revolution*) in the case of their state, and those of every nation are destined to do the same in one way or another, each according to its historical and economic development, *some with much violence, most, I hope, with but little*."

### "Communist Position on the Negro Question."

This is a booklet of several pages and bears on the front of its cover a map of the United States showing a dark

belt stretching across considerable portions of Georgia and eight other southern states. Parts of the text are here copied.

"The slogan of the right of self-determination occupies the central place in the liberation struggle of the Negro population in the Black Belt against the yoke of American imperialism. But this slogan, as we see it, must be carried out only in connection with two other basic demands. Thus, there are three basic demands to be kept in mind in the Black Belt, namely, the following:

"(a) *Confiscation of the landed property of the white landowners and capitalists for the benefit of the negro farmers.* The land property in the hands of the white American exploiters constitutes the most important material basis of the entire system of national oppression and serfdom of the Negroes in the Black Belt. More than three-quarters of all Negro farmers here are bound in actual serfdom to the farms and plantations of the white exploiters by the feudal system of 'share cropping.'

.        .        .        .        .

"Without this *revolutionary measure,* without the *agrarian revolution,* the right of self-determination of the Negro population would be only a Utopia or, at best, would remain only on paper without changing in any way the actual enslavement.

"(b) Establishment of the State Unity of the Black Belt. At the present time this Negro zone—precisely for the purpose of facilitating national oppression—is artificially split up and divided into a number of various states which include distant localities having a majority of white population. If the right of self-determination of the Negroes is to be put into force, it is necessary wherever possible to bring together into one governmental unit all districts of the South where the majority of the settled population consists of negroes. Within

the limits of this state there will of course remain a fairly significant white minority which must submit to the right of self-determination of the negro majority. . . .

"(c) Right of Self-Determination. This means complete and unlimited right of the negro majority to exercise governmental authority in the entire territory of the Black Belt, as well as to decide upon the relations *between their territory and other nations, particularly the United States*."

.            .            .            .            .

"Even if the situation does not yet warrant the raising of the question of uprising, one should not limit oneself at present to propaganda for the demand, 'Right to Self-Determination,' but should *organize mass actions, such as demonstrations, strikes, tax boycott movements*, etc."

.            .            .            .            .

"A direct question of power is also the demand of *confiscation* of the land of the white exploiters in the South, as well as the demand of the negroes that the entire Black Belt be amalgamated into a State unit.

"Hereby, every single fundamental demand of the liberation struggle of the negroes in the Black Belt is such that—if once thoroughly understood by the negro masses and adopted as their slogan—it will lead them into the struggle for the overthrow of the power of the ruling bourgeoisie, which is impossible without such revolutionary struggle. One cannot deny that it is just possible for the negro population of the Black Belt to win the right to self-determination during capitalism; but it is perfectly clear and indubitable that this is possible only through *successful revolutionary struggle* for power against the American bourgeoisie, through *wresting* the negroes' right of self-determination *from American imperialism*. Thus, the slogan of right to self-determination is a real slogan of *National Rebellion* which, to be

considered as such, need not be supplemented by proclaiming struggle for the complete separation of the negro zone, at least not at present.

"(d) Communists must fight in the forefront of the national liberation movement and must do their utmost for the progress of this mass movement and its revolutionization. Negro Communists must clearly dissociate themselves from all bourgeois currents in the negro movement, must indefatigably oppose the spread of the influence of the bourgeois groups on the working negroes."

.         .         .         .         .

"Their constant call to the negro masses must be: *Revolutionary struggle* against the ruling white bourgeoisie, through a *fighting alliance* with the *revolutionary* white proletariat! ˙

.         .         .         .         .

"We are Bolsheviks, members of a fighting Party of the working class, who know that the only road to the *revolutionary overthrow* of capitalism and the establishment of Communism is through welding together the iron unity of class idealogy which penetrates into our ranks, as the prerequisite to the *effective struggle* against the class enemy *physically.*"

There was no direct testimony that Herndon distributed the literature just described. No member of the Communist Party came forward to tell what he did in their meetings or in inducing them to become members. Nor does this seem strange when regard is had to the obligation taken by members and to the discipline imposed. Nevertheless there was evidence from which distribution by him reasonably could be inferred. It was shown that he was an active member, was sent to Atlanta as a paid organizer, and was subject to party discipline; also that he received the literature for distribution in the course of his work and had copies of it, together with cur-

rent membership and collection books, under his arm when he was arrested; and further that he had been soliciting and securing members, which was part of the work in which the literature was to be used. He had declared his "adherence to the program and statutes" of the party and had taken like declarations from those whom he secured as members; and this tended strongly to show not only that he understood the party program and statutes as outlined in the literature but also that he brought them to the attention of others whom he secured as members. Besides, at the trial he made an extended statement to the court and jury in his defense,[6] but did not refer in any wise to the literature or deny that he had been using or distributing it. Thus there was in the evidence not merely some but adequate and undisputed basis for inferring that he had been using the literature for the purposes for which he received it. Evidently, and with reason, the jury drew this inference.

It should not be overlooked that Herndon was a negro member and organizer in the Communist Party and was engaged actively in inducing others, chiefly southern negroes, to become members of the party and participate in effecting its purposes and program. The literature placed in his hands by the party for that purpose was particularly adapted to appeal to negroes in that section, for it pictured their condition as an unhappy one resulting from asserted wrongs on the part of white landlords and employers, and sought by alluring statements of resulting advantages to induce them to join in an effort to carry into effect the measures which the literature proposed. These measures included a revolutionary uprooting of the existing capitalist state, as it was termed; confiscation of the landed property of white landowners and capitalists for the benefit of negroes; es-

---

[6] See Georgia Code 1933, § 38–415.

tablishment in the black belt of an independent State, possibly followed by secession from the United States; organization of mass demonstrations, strikes and tax boycotts in aid of this measure; adoption of a fighting alliance with the revolutionary white proletariat; revolutionary overthrow of capitalism and establishment of Communism through effective physical struggles against the class enemy. Proposing these measures was nothing short of advising a resort to force and violence, for all know that such measures could not be effected otherwise. Not only so, but the literature makes such repelling use of the terms "revolution," "national rebellion," "revolutionary struggle," "revolutionary overthrow," "effective physical struggle," "smash the National Guard," "mass strikes," and "violence," as to leave no doubt that the use of force in an unlawful sense is intended.

The purpose and probable effect of such literature, when under consideration in a prosecution like that against Herndon, are to be tested and determined with appropriate regard to the capacity and circumstances of those who are sought to be influenced.[7] In this instance the literature is largely directed to a people whose past and present circumstances would lead them to give unusual credence to its inflaming and inciting features.

And so it is that examination and consideration of the evidence convince me that the supreme court of the State applied the statute, conformably to its opinion, as making criminal an attempt to induce and incite others to join in combined *forcible* resistance to the lawful authority of the State.

That the constitutional guaranty of freedom of speech and assembly does not shield or afford protection for acts of intentional incitement to forcible resistance to the lawful authority of a State is settled by repeated deci-

---

[7] *Burns* v. *United States*, 274 U. S. 328, 335.

sions of this Court;[8] and the Georgia decisions are to the same effect.[9]

Under the statute as construed and applied it is essential that the accused intended to induce combined forcible resistance. The presence of the intent aggravates the inducement and brings it more certainly within the power of the State to denounce it as a crime than otherwise it would be. The supreme court of the State in both of its opinions was dealing with a statute and a charge in which the intent of the accused was an element of the offense. In the original opinion the court incautiously said "it would be sufficient that he intended it [the combined and forcible resistance] to happen at any time." In its opinion on rehearing it said the phrase "at any time" had not been intended to mean any time in the indefinite future; and by way of avoiding such a meaning the court changed that part of the original opinion by making it read "at any time within which he might reasonably expect his influence to continue to be directly operative in causing such action by those whom he sought to induce." I do not perceive that this puts the standard of guilt at large or renders it inadmissibly vague. The accused must intend that combined *forcible* resistance shall proximately result from his act of inducement. There is no uncertainty in that. The intended point of time must be within the period during which he "might reasonably expect" his inducement to remain *directly* operative in causing the combined forcible resistance. The words "might reasonably expect" have as much precision as is admissible in such a matter, are not

---

[8] *Gitlow* v. *New York,* 268 U. S. 652, 666, *et seq.; Whitney* v. *California,* 274 U. S. 357, 371; *Fiske* v. *Kansas,* 274 U. S. 380, 385; *Stromberg* v. *California,* 283 U. S. 359, 368; *Near* v. *Minnesota,* 283 U. S. 697, 708.

[9] *Carr* v. *State,* 176 Ga. 55; 166 S. E. 827, 167 S. E. 103; *Carr* v. *State,* 176 Ga. 747; 169 S. E. 201.

difficult to understand, and conform to decisions heretofore given by this Court in respect of related questions.[10] I therefore am of opinion that there is no objectionable uncertainty about the standard of guilt and that the statute does not in that regard infringe the constitutional guaranty of due process of law.

Believing that the statute under which the conviction was had is not subject to the objections leveled against it, I think the judgment of the supreme court of the State denying the petition for *habeas corpus* should be affirmed.

MR. JUSTICE MCREYNOLDS, MR. JUSTICE SUTHERLAND and MR. JUSTICE BUTLER join in this dissent.

---

[10] *Waters-Pierce Oil Co.* v. *Texas*, 212 U. S. 86, 108–111; *Nash* v. *United States*, 229 U. S. 373, 376–378.