## Commonwealth v. Hechtman et al.

*Vincent G. Panati,* for Commonwealth.

*A. Harry Levitan,* for defendants.

LEVINTHAL, J., February 5, 1952.—Defendants are charged with nuisance. This charge grows out of the distribution by defendants of copies of the Worker, a newspaper containing articles allegedly of an "inflammatory" nature.

Excerpts from the articles are set forth in the Commonwealth's bill of particulars. Included in the news reports are an estimate of the number of casualties suffered by the United Nations forces during a particular month of the fighting in Korea; a prediction of an increase in the proportion of casualties among troops of the United Nations to those of the North Korean forces; the charge that the hostilities in Korea were planned and begun by John Foster Dulles, Secretary of Defense Johnson and Generals Bradley and MacArthur; that the fighting is being continued out of profit motives, and finally an allusion to the strike breaking tactics employed by Philadelphia police during the course of a recent local labor dispute.

The bill of indictment avers that these reports tend (1) to create anxiety, fear, terror and alarm in the minds of members of the community, (2) to arouse suspicion in the public mind as to the propriety of the motives of the persons responsible for the American military policy in Korea, and (3) to vilify and cause to be held in contempt the Government of the United States and the Nation's military arm. Defendants have demurred to the bill of indictment.

The penalty for common nuisance in this Commonwealth is prescribed by statute: Act of June 24, 1939, P. L. 872, sec. 612, 18 PS §4612. Nowhere in The Penal Code, however, does one find a definition of the offense.

It becomes necessary, therefore, to look to the common law in order to determine whether any particular conduct falls within the offending class.

In general, "whatever openly outrages decency, or is injurious to public morals or public health and comfort, is a common nuisance . . .": Wharton's Criminal Law, vol. 2, §1678 (12th ed.) Judge Allison in Commonwealth v. Cassidy, 6 Phila. 82 (1865), relied upon by the Commonwealth as a precedent for the instant prosecution, put it thus:

". . . whatever injuriously affects the health or the morals of a large class of the community, is indictable as a common nuisance."

The charge against these defendants is the circulation of copies of a newspaper. It is important to note that no complaint is made of the manner in which defendants were distributing the copies. There is no allegation, for instance, that defendants were conducting themselves in a loud or boisterous manner, or that their actions were in any way offensive or likely to cause a breach of the peace, or that they were interfering with the right of the public to an unobstructed use of the highways. The criminal nature of the act of distributing the newspaper in question, according to the allegations of the bill, lies simply in the subject matter of the articles contained therein or, more accurately, in the tendencies of these articles because of their subject matter.

The facts averred in the bill bear a resemblance to the common-law form of nuisance described as "false newsmongering". Wharton's Criminal Law, vol. 2, §1721 (12th ed.) As this description unmistakably indicates, one of the necessary ingredients of the offense is the *falsity of the circulated report*. This fact is illustrated by the case of Commonwealth v. Cassidy, supra, where defendants were charged with circulating a false report of the presence in the community

of a dangerous kidnapper. While such conduct was held properly indictable, the opinion of the court observes that "if the facts corresponded with the report, no indictment would lie. . . ."

Since falsity of content is an essential element of the crime of false newsmongering, it would seem to follow that the offense is insufficiently averred where no such allegation appears in the bill of indictment. Nowhere does the present bill aver that the newspaper articles, with whose circulation defendants are charged, are in any respect untrue.

Regardless of any personal feelings we may entertain with respect to the truthfulness or untruthfulness of the newspaper reports under consideration, we are unable, for purposes of passing on the question of the sufficiency of the bill of indictment raised by the demurrer, to take judicial notice of their falsity. In our opinion it is obvious that the offense or nuisance, sought to be charged in the instant bill, is insufficiently averred, and the demurrer must be sustained.

There are additional and more fundamental considerations which convince us that the instant bill could not be permitted to stand, even if it had been expressly averred that the articles in the newspaper were false.

We are reminded of the words of the late Chief Justice Hughes, speaking for the United States Supreme Court in Near v. Minnesota ex rel., Olson, county attorney, 283 U. S. 697 (1930), at page 707:

"This statute, for the suppression as a public nuisance of a newspaper or periodical, is unusual, if not unique, and raises questions of grave importance transcending the local interests involved in the particular action."

Defendants were engaged at the time of their arrest in an activity which, under ordinary circumstances, is within the protection of both the Federal and State

Constitutions. It is settled that the freedom of the press, guaranteed by the Federal Constitution, protects the distribution, as well as the actual publication, of printed matter: Lovell v. City of Griffin, 303 U. S. 444, 452 (1937) ; Martin v. Struthers, 318 U. S. 139, 143 (1942) ; Jamison v. Texas, 318 U. S. 413 (1942). See also Murdock v. Pennsylvania, 319 U. S. 105, 114-117 (1942).

Moreover, the protection thus afforded embodies "much more than an order . . . not to cross the boundary which marks the extreme limits of lawful suppression . . . It is a declaration of national policy in favor of the public discussion of all public questions . . . Our Bills of Rights . . . urge upon every official of the three branches of the state a constant regard for certain declared fundamental policies of American life": Chafee, Freedom of Speech in War Time, 32 Harv. L. Rev. 932, 934 (1919).

This is not to say that the right to a free press is absolute, any more than our other constitutional freedoms are absolute. The area of its permissible exercise is defined and limited by a corresponding duty to refrain from making such use of the right as unreasonably tends to injure the person·or property of other members of the community, or to jeopardize the peace and good order of the community itself. It is, of course, difficult to fix the precise line of demarcation that establishes the end of constitutionally protected activities and the beginning of conduct properly subject to prohibition in the interest of the common good. Our courts have laid down certain standards and criteria which must be met if a particular exercise of the State's police power is to survive a contest of its constitutionality. Basically, the test is threefold. Most fundamental is the requirement that the evil, at whose prevention or correction the police power is aimed, be

one which is properly within the State's authority to avert. The second safeguard involves simply an application of the law of probabilities, and requires that the likelihood of the actual occurrence of the evil condition be "clear and present". Finally, it is necessary that the threatened evil condition be of a relatively serious nature.

All three of these considerations appear in Chief Justice Vinson's summary of the law, found in the opinion of the court in American Communications Assn., CIO, et al. v. Douds, etc., 339 U. S. 382 (1949), 397: "So far as the [Schenk v. United States, 249 U. S. 47 (1918)] case itself is concerned, imminent danger of any substantive evil that Congress may prevent justifies the restriction of speech. Since that time this Court has decided that however great the likelihood that a substantive evil will result, restrictions on speech and press cannot be sustained unless the evil itself is 'substantial' and 'relatively serious'. Brandeis, J. concurring in *Whitney vs. California,* supra at 374, 377 (274 U. S. 357) or sometimes 'extremely serious', *Bridges vs. California,* 314 U. S. 252, 263 (1941). And it follows therefrom that even harmful conduct cannot justify restrictions upon speech unless substantial interests of society are at stake."

While it is true that the Douds case involved the validity of Federal legislation, the principles expressed therein apply with equal force to action by the State: Herndon v. Lowry, Sheriff, 301 U. S. 242 (1936); West Virginia State Board of Education et al. v. Barnette et al., 319 U. S. 624 (1942); Thomas v. Collins, Sheriff, 323 U. S. 516 (1944).

Therefore, combining the three elements just discussed, we find that conduct which assumes the form of activity guaranteed by the Constitution to be free from governmental interference is liable to proscrip-

tion only when it clearly endangers some relatively substantial public interest which is within the power of government to protect.

Inquiring first as to the public interest alleged to have been endangered by the acts charged in the indictment, it would appear to be the contention of the Commonwealth that the evil resulting from defendants' activity is the creation of fear and alarm in the community, the awakening of suspicion in the minds of readers, and the exposing of the government to contempt. We perceive no substantive evil in the alleged attempt to disturb the mental repose of the readers of the newspapers distributed by defendants and to arouse suspicion of and hostility to our government. The best tradition of our judicial process senses with alarm the unmistakable aroma of "thought control" which pervades all attempts to punish expressions of dissatisfaction with public officials or government policies.

"One of the prerogatives of American citizenship is the right to criticize public men and measures—and that means not only informed and responsible criticism but the freedom to speak foolishly and without moderation": Baumgartner v. United States, 322 U. S. 665, 673-74 (1943).

"Those who won our independence believed . . . that the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of American government. They recognized the risks to which all human institutions are subject. But they knew that order cannot be secured merely through fear of punishment for its infraction; that it is hazardous to discourage thought, hope and imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; that the path of safety lies in the

opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones": Concurring opinion of Mr. Justice Brandeis in Whitney v. California, 274 U. S. 357, 375 (1927).

Former Attorney General Francis Biddle has described the foregoing language as "that eloquent passage which so splendidly speaks in the American, the great tradition." (Biddle, The Fear of Freedom (1951), at p. 103). The author further notes that "like all words that were destined for immortality, [it] is as applicable today as it was when he spoke." Mr. Brandeis' pronouncement has frequently been echoed in judicial opinions. See In re Spain in Flames, 36 D. & C. 285, 287 (1937), where we expressed our confidence that "the popular good sense will ultimately discover and prefer truth and that the general welfare can best be served only by a free expression of opinion."

The United States Supreme Court has said in more recent years that "the vitality of civil and political institutions in our society depends on free discussion. . . . Accordingly a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for the acceptance of an idea": Terminiello v. Chicago, 337 U. S. 1, 4 (1949).

The suggestion that the evil resulting from defendants' conduct is the creation of alarm in the community, thus endangering the "public welfare", is of no merit. The phrase "public welfare" may be construed as embracing simply the notions of comfort, contentment and freedom from disturbance. It is clear, how-

ever, that "freedom of speech, though not absolute, is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil *that rises far above public inconvenience, annoyance or unrest"*: Terminiello v. Chicago, supra, at page 4. (Italics supplied.)

There can be no question of the applicability of this principle where the right asserted is, as here, the freedom of the press.

We are unable to find in the bill of indictment any allegation, nor do we construe it as intending to charge, that the *morals* of the public are in any way jeopardized by the news articles here involved. Bearing in mind the references in the bill to "terror" and "alarm", the question arises whether the conduct complained of can be construed as an offense to the public health. For it cannot be disputed that the public health is both a vital interest and one which the State may lawfully protect.

We find it impossible to believe that the newspaper articles in question are of such a nature as to pose a clear and present danger of causing injury to the health of persons who might read them. The creation of an emotionally disturbed public mental state, claimed by the Commonwealth to be the result of the circulation of these "inflammatory" newspaper articles, cannot be regarded as a serious menace.

We have observed above that the *methods* employed by defendants in the distribution of the paper were reasonable as to time, manner and place. No immediate evil is foreseen, such as a breach of the peace (Chaplinsky v. New Hampshire, 315 U. S. 568 (1941)) or other physical disturbance: Kovacs v. Cooper, Judge, 336 U. S. 77 (1948).

The sole danger envisioned here is damage to health resulting directly from the mere circulation of the

printed news reports. We are not facetious when we say that this is an awesome portrayal of the power of the pen. It is with some difficulty that the mind's eye is brought to focus on a scene which depicts stricken men and women, victims of the written word. Yet, it would be rash, we think, to deny the possibility of any publication having such terrifying effects as to render its author liable to punishment on such a theory. One can imagine the profound shock which would greet the appearance in a widely read and reputable newspaper of banner headlines proclaiming the imminent arrival of hostile atom bombers. Nor are most of us likely to forget the unfortunate tidal wave of hysteria which swept parts of the Nation a few years ago in the wake of a certain radio "news report" of hordes of invading Martians. Other minds may be capable of duplicating that epic of horror. However, to liken the news articles here in dispute to such portents of terror as these is, in our mind, extremely far-fetched.

We cannot believe that any of the matters contained in the newspaper articles which we have before us constituted the slightest threat to the health of persons in the community. Considering the source of the articles, a notoriously partisan publication of relatively slender circulation, and noting the patent absurdity of the contents of the articles themselves, we are of the opinion that the only state of mind likely to result from a writing of the sort here in question is one of simple incredulity, and the most violent emotion apt to be stirred in the reader one of disgust, contempt, or amusement.

For the additional reason, therefore, that the acts described in the indictment are within the protection of the Pennsylvania and United States Constitutions, the bill fails to set forth a punishable offense, and the demurrer must be sustained.